# EXHIBIT B

# SPEISER KRAUSE

COUNSELLORS AT LAW

*800 Westchester Avenue*
*Suite South 608*
*Rye Brook, New York 10573*

PHONE: (914) 220-5333  FAX: (914) 220-5334

WWW.SPEISERKRAUSE.COM

5555 GLENRIDGE CONNECTOR
SUITE 550
ATLANTA, GA 30342
T: (404) 751-0632
F: (866) 936-6382

2617 HUNTINGDON PIKE
SUITE 101
HUNTINGDON VALLEY, PA 19006
T: (215) 884-8190
F: (215) 884-8266

# 70
*years*  March 31, 2025

*VIA FEDERAL EXPRESS*

Office of the Executive Secretary
MS 0525 Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

> Re:    Marianne Copenhaver
>        Shooting at the Presidential Rally in Butler, PA
>        Date of Incident: July 13, 2024

Dir Sir/Madam:

This office, along with the Law Offices of Max Feldman, have been retained by Mrs. Marianne Copenhaver in connection with the above-captioned matter. In this regard, enclosed please find an original and one (1) copy of the Claim for Damage, Injury, or Death, Standard Form 95 ("Form 95") due to the injuries Mrs. Copenhaver sustained as a result of the above-referenced incident.

Would you be so kind as to file the original Form 95 enclosed herein, date-stamp the copy indicating that the Form 95 has been received by your office and return the date-stamped copy to me in the enclosed federal express envelope.

Thank you for your courtesy and consideration in this regard. Of course, if you need additional information, please contact me.

Very truly yours,

Douglas A. Latto

DAL:klv
Enclosures
cc:    Joseph Feldman, Esq.
       Nicholas Feldman, Esq.

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Office of the Executive Secretary<br>MS 0525 Department of Homeland Security<br>2707 Martin Luther King Jr Ave SE<br>Washington, DC 20528-0525 | Marianne Copenhaver<br>c/o Speiser Krause PC<br>800 Westchester Avenue, Suite S-608<br>Rye Brook, New York 10573 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY　☒ CIVILIAN | 4. DATE OF BIRTH<br>02/21/1951 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>07/13/2024　　Saturday | 7. TIME (A.M. OR P.M.)<br>6:11 P.M. |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attached Rider

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached Rider

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| See attached Rider | See attached Rider |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| | 30,000,000 | | 30,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>*Marianne Copenhaver* | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>(724) 459-8087 | 14. DATE OF SIGNATURE<br>3-19-25 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction<br>Previous Edition is not Usable<br>95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2

RIDER TO FORM 95

8.    The basis of this claim is under the Federal Tort Claims Act, 28 U.S.C. § 1346 and 28 U.S.C. § 2671, *et seq.*

This notice of claim is filed by and on behalf of the Claimant, Marianne Copenhaver (the "Claimant"). The instant claim is brought for all injuries sustained by Claimant as a result of her husband being shot and severely, permanently and grievously wounded on July 13, 2024, at approximately 6:11 P.M., while he was attending a presidential campaign rally located near Butler, Pennsylvania, at the Butler Farm Show Grounds (the "Butler Rally"), for then-candidate Former President of the United States of America Donald J. Trump (referred to as "President Trump"). Claimant seeks all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, at approximately 6:11 P.M., due to, in whole or in part, the negligence, recklessness and/or carelessness of the Department of Homeland Security, United States Secret Service (collectively referred to as "USSS"), its employees, agents, servants and/or representatives, including, federally-employed Secret Service Special Agents, and/or others, assigned to the Butler Rally to provide, amongst other things, security to ensure the safety of all persons in attendance at the Butler Rally, specifically including the Claimant's husband, and said individuals failed to provide required, proper, appropriate, timely and/or necessary security and/or other services and/or fulfill their responsibilities at the Butler Rally, and in advance of the Butler Rally, which failures proximately caused, in whole or in part, the shooting complained of herein. As a result of the shooting that occurred at the Butler Rally, Claimant's husband was severely, permanently, seriously and grievously injured, and as a result thereof, Claimant has suffered damages as set forth herein. Claimant's injuries are permanent in nature. The events which led to Claimant's husband being shot and his resulting grievous and permanent injuries were shocking and preventable, should not have happened, and the failures, as highlighted herein, exposed President Trump, and all Butler Rally attendees, specifically including the Claimant's husband, to grave, mortal danger.[1]

On and prior to July 13, 2024, the United States of America, through the USSS, was responsible for, amongst other things, providing security and/or developing and implementing an appropriate site security plan at Presidential campaign events, specifically including at the Butler Rally, to ensure the safety of all attendees at the event, including, but not limited to, preventing a shooting and/or assassination attempt. These responsibilities were even more acute at the Butler Rally since the campaign event involved the leading candidate and former President of the United States who had been the subject

---

[1] A separate SF-95 ("Form 95") is being filed on behalf of the Claimant's spouse, Mr. James Copenhaver for his severe, serious, grievous, and permanent injuries as a result of the shooting complained of herein.

1

of death threats. In addition, in providing required security and protective services at such events including, but not limited to, the Butler Rally, the USSS is required to abide by and adhere to various policies and procedures specifically designed to mitigate risk and ensure the safety of all event attendees. As highlighted herein, the USSS violated and breached various applicable policies and procedures and failed to provide adequate security, including failing to implement and execute an appropriate security plan, which, individually and/or collectively, in whole or in part, allowed and proximately caused the shooting complained of herein which resulted in Claimant's husband's serious, severe, grievous and permanent physical, mental, economic and other injuries, and in turn caused the Claimant to suffer damages as set forth herein.

All of the foregoing is based upon information and belief and is not intended as a complete encapsulation of all facts leading up to the shooting complained of herein. However, the failures that occurred on July 13, 2024, and in the days preceding the campaign event were rampant, unacceptable and were clear violations of directives, procedures, protocol, and mandated standards and caused, in whole or in part, the shooting and Claimant and her husband's injuries as set forth herein.

Briefly, on July 2, 2024, the Secret Service assigned to President Trump (referred to as the "Trump Security Detail") notified the USSS, specifically including the USSS's Pittsburgh Field Office, regarding a potential campaign stop in Pennsylvania tentatively scheduled for July 13, 2024. At that time, the Pittsburgh Field Office began assigning personnel to this potential visit. The public was informed the following day that President Trump would make a campaign stop in western Pennsylvania. On July 4, 2024, the Trump Security Detail advised the USSS that the event on July 13, 2024, identified herein as the Butler Rally, would take place at the Butler Farm Show Grounds located near Butler, Pennsylvania.

The Butler Farm Show Grounds are a vast property consisting of more than 100 acres. Although the property itself is privately owned, the land is available for public use with at least seven entrances that are open to the public. Advance planning for the Butler Rally began on July 5, 2024, when the USSS sent an email to various state and local law enforcement agencies and counterparts (collectively referred to as "LLE"), inviting them to a meeting on July 8, 2024, to discuss the event.

On the morning of July 8, 2024, the USSS conducted a "walk through" of the Butler Farm Show Grounds with numerous individuals, including President Trump's campaign staff, where several security items were discussed, including, where the stage will be located as well as line of sight mitigation to prevent any attempted assassination of President Trump.

Later that same day, LLE personnel conducted their own meeting where security was also discussed, including, the site, security perimeter and the route that President Trump's motorcade would take to and from the Butler Rally. At that time, LLE was provided with USSS contact information to discuss a "telephonic" advance meeting.

2

On July 9, 2024, the USSS met with LLE including representatives from the Pennsylvania State Police ("PSP"), and this meeting specifically included a discussion of the AGR Complex (a building and grounds located on the Butler Farm Grounds). This meeting reflects the first of numerous critical communication failures between the USSS and LLE. During a subsequent government investigation into the assassination attempt of President Trump at the Butler Rally, USSS advised that it believed that LLE and PSP were responsible for "locking down" and securing the AGR site. The PSP and LLE refuted that assertion advising that PSP recalled no discussion that it was responsible for the AGR Complex, and that PSP was not asked to cover the AGR Building. This unacceptable lack of understanding set in motion the events that allowed an individual by the name of Thomas Crooks (the "Shooter" or "gunman") to climb onto the roof of the AGR Building which in turn, allowed him to fire eight shots at President Trump, one of which severely, permanently and grievously injured the Claimant's husband, resulting in her damages as set forth herein.

On July 10, 2024, the USSS conducted another walkthrough of the event site to undertake a workforce assessment for site security. Purportedly, the AGR Building and complex was discussed, and the USSS advance personnel claim that they were advised, amongst other things, that LLE would provide police, patrol cars, and counter-sniper teams and that there would be various obstructions of line of sight from the AGR Complex to the stage where President Trump was to speak. Despite that the AGR Complex was discussed during this walkthrough, there was a stunning lack of communication and coordination as to which agency would secure the AGR Complex despite that the security for the event ultimately rests with the USSS.[2]

On July 11, 2024, the USSS met again with LLE at the site of the Butler Rally. Line of sight mitigation issues were purportedly discussed at this time, including with President Trump's Security Detail. Additional communication failures resulting in security lapses apparently occurred at this meeting, and thereafter. The USSS believed that LLE and PSP would provide more patrol and a heightened police presence around the AGR Complex; LLE and PSP apparently advised that they did not have the resources to do that. In addition, this was the last meeting between the USSS and LLE concerning site security.

The next day, July 12, 2024, USSS met with President Trump's campaign staff. Line of sight mitigation from the AGR Complex to the stage was again discussed, including possibly placing large farm equipment between the AGR Building and stage to mitigate these concerns. Also, on this date, LLE completed its site plan for the event, but it was not sent to the USSS nor did the USSS ask to *see or review* the plan. This is yet another extraordinary failure on the part of the USSS given that ultimate site security is its responsibility.

---

[2] Making this failure more grievous is the fact that the unsecured AGR rooftop was a clear and significant security risk with a previously identified short range line of sight sniper position directly to the podium from which President Trump would be delivering his remarks.

The Butler Rally took place the following day on July 13, 2024. Prior to the event, as highlighted herein, the security failures were rampant, including, but not limited to, the failure on the part of the USSS to communicate and properly delineate and define appropriate security responsibilities, establish and implement an appropriate site security plan, mitigate line of sight concerns, etc. Gaps in the security plan were evident including that there was no confirmation by the USSS as to who was to secure and protect the AGR Complex notwithstanding its proximity to the event and the direct line of site to the stage where President Trump was to address the rally. Although discussed in the days leading up to the event, no line of sight mitigation efforts occurred between the AGR Complex and the stage from which President Trump was to address the rally's attendees. These failures are the responsibility of the USSS as it is ultimately responsible for *all* site security and the safety of those in attendance including the Claimant's husband.

Notwithstanding the failures leading up to the event, the failures on the day of the event compounded the prior failures and directly led, in whole or in part, to the shooting in which Claimant's husband was grievously injured. In the hours leading up to the event, LLE conducted its own security meeting, and the USSS did likewise. Stunningly, no one from the USSS attended the LLE security briefing leading to further confusion and a misunderstanding of security responsibilities and communication methods and protocols.

On the day of the event, USSS set up a communication and command center on the rally grounds (the "USSS Security Room" or "Security Room"). Contrary to policy and procedure, and notwithstanding that LLE was delegated by the USSS to provide, amongst other things, site security, no LLE personnel were located within the USSS Security Room. Rather, only a representative from the PSP was located within and in direct contact with agents of the USSS in the Security Room. In addition, and also contrary to policy and procedure, LLE set up its own separate command center in a trailer on the property which was not staffed by USSS personnel. These separate command centers resulted in fragmented and improper communication between LLE, PSP and the USSS, and these communication failures were critical on the day of the rally, especially in the moments leading up to the shooting. Moreover, contrary to policy and procedure, the USSS had a complete misunderstanding concerning the LLE command center. The USSS believed that the trailer was to be used only for medical emergencies and line of sight mitigation – not a critical communications post where vital information concerning site security was shared. Also, radio communication failures had occurred within the LLE trailer, which required an individual in the trailer to communicate with the PSP representative who was located within the USSS Security Room by cellular telephone.

Technology failures on July 13, 2024, were not limited to radio communications. As part of its security responsibilities, the USSS employs a counter-unmanned aerial system (C-UAS) to monitor drone activity at a particular event. The C-UAS is an unmanned drone which can detect if another drone is being used to surveil an event. If the C-UAS detects other drone activity, an alert is sent to the USSS which advises USSS agents that a drone has been detected, and it can provide the location of the drone pilot who could then be

4

questioned by USSS personnel. It is also believed that the day prior to the event, the USSS advised LLE that certain of its officers would likewise receive an alert from the C-UAS to assist in investigating any suspicious drone activity.

However, on the morning of the Butler Rally, the C-UAS was determined to be inoperative and astonishingly, the C-UAS operator spent most of the morning and early afternoon on the phone with the manufacturer's "800 number" to troubleshoot the issue. The USSS agent responsible for the operation of the C-UAS did not test the system since it was last used nor did he have any spare parts to fix the unit. The C-UAS did not become operable until approximately 4:30 p.m. on the day of the event.

While the C-UAS was inoperative, and at 3:51 p.m., the Shooter flew a drone over the rally site for close to 12 minutes. This allowed the Shooter to view the stage, podium, and surrounding area where President Trump was going to speak. If the C-UAS was operational when the Shooter operated his drone, which it should have been, the C-UAS would have detected this and notified the USSS and others of the location of the Shooter almost two and one-half hours prior to the shooting. USSS personnel could then have interviewed the Shooter at that time, and this likely would have prevented the shooting and Claimant's resulting injuries. The C-UAS ultimately became operable at approximately 4:30 p.m., but by this time, it was too late as the Shooter had already completed his drone surveillance.

Unacceptable radio communication issues also persisted throughout the hours before the shooting. As a result, the USSS advised its agents standing posts that they should switch to a different radio channel to assure better communications. This further resulted in fragmented and inappropriate lines of communication within the USSS itself as well as with LLE and PSP.

At approximately 4:30 p.m., President Trump's aircraft landed in Pennsylvania, and he arrived at the site of the Butler Rally at a little after 5:30 p.m. However, prior to this and at approximately 5:00 p.m., LLE officers noticed the Shooter acting erratically, and his behavior raised suspicion. It is believed that this assessment was made independently by various LLE personnel, but these suspicions were not communicated to the USSS at that time, in part, due to the above-mentioned communication issues. Apparently, the USSS's site security plan failed to include required common communication channels so that all agencies were aware of issues involving a potentially dangerous individual. Shortly thereafter, LLE took pictures of the Shooter and circulated those pictures to other LLE personnel.

At around 5:10 p.m., the Shooter was again seen by LLE personnel, but this time, the Shooter was observed using a *range finder* from his position near the AGR Complex to the stage. As a result, LLE appropriately began an active search for the Shooter. One LLE officer observed the Shooter via binoculars moving in and out of sight by the AGR Complex. LLE continued their active search for the Shooter until about 5:40 p.m. At this time, an LLE officer texted several LLE counter-snipers advising them of the Shooter and further advised that those individuals could notify the USSS of this suspicious individual.

5

By no later than 5:51 p.m. (approximately 20 minutes before the shooting), certain USSS agents were aware of the Shooter including his prior movements and description. Despite this knowledge, and contrary to policy and procedure, this information was not widely disseminated to other USSS personnel. Moreover, given the other inoperable and fragmented methods of communication between LLE and the USSS, the USSS agents assigned to the Security Room were not previously aware of the suspicious behavior exhibited by the Shooter.

By 5:42 p.m., an LLE counter sniper advised individuals in the LLE trailer about the Shooter, including his description and the fact that he previously was using a range finder. Shortly thereafter, LLE contacted the PSP officer located in the USSS Security Room via cell phone to advise of the Shooter. The LLE caller heard the PSP officer discussing this information with others in the USSS Security Room. This information was also shared by LLE with USSS counter sniper personnel which included a "Be on the Lookout" ("BOLO") for the Shooter. Regardless, as mentioned above, by no later than 5:51 p.m., the USSS Security Room had received photos of the Shooter.

Moreover, despite that the USSS was specifically aware of the Shooter and his extraordinarily suspicious behavior, at no time was this information passed along to President Trump's Security Detail (the individuals who most acutely needed to be aware of this information) or anyone near the stage, nor was this information relayed to other USSS personnel responsible for site security.

Shortly after 5:51 p.m., the Shooter was again observed near the AGR Complex, but no LLE or USSS personnel were in the vicinity. It was at this same time that certain LLE personnel then observed the Shooter "running". This information was put out over the LLE radio system, and LLE was searching for the Shooter again. Between 6:00 p.m. and 6:09 p.m., several USSS agents (including senior USSS personnel) entered the USSS Security Room. Despite that the information regarding the Shooter made its way to the USSS Security Room no later than 5:51 p.m., these agents who began entering at 6:00 p.m. and after were not advised or made aware that an active search was ongoing for a suspicious individual identified as the Shooter.

Approximately 6 minutes prior to the shooting, the Shooter climbed onto the roof of a Building located in the AGR Complex by scaling air conditioning units located near the roof, with a weapon. Several bystanders saw the Shooter do this, and they attempted to advise LLE of the Shooter's presence on the roof. The Shooter was observed moving across multiple roofs of buildings within the AGR Complex from 6:05 p.m. through 6:08 p.m. However, given the USSS failures as highlighted herein, no one was actually assigned to monitor the roof of buildings located at the AGR Complex. This was especially egregious and contrary to USSS policy and procedure, given that the roof allowed a direct line of sight to the stage where President Trump was to speak, and the USSS knew and had discussed this risk on numerous occasions but blatantly failed to mitigate these line of sight concerns.

6

In the approximate three minutes before the shooting, an LLE officer approached the AGR Complex and observed the Shooter on the roof. No USSS personnel were observed in the vicinity of the AGR Buildings.

The approaching officer then radioed other LLE personnel advising that an individual was on the roof of an AGR Building. Given the USSS's failure to establish a cohesive, integrated and common line of communication, this specific transmission never made its way to the USSS.

However, by 6:09 p.m. – after President Trump had already taken the stage and approximately two minutes before the shooting - the USSS Security Room *was* aware of a suspicious individual on the roof of an AGR Building. This is known because LLE called the PSP officer in the USSS Security Room via cellular telephone to advise him of this information. In addition, slightly before the LLE phone call to PSP regarding a person on the AGR roof, a USSS agent staffing a post was made aware of a suspicious person lurking around the AGR Complex. It is believed that this USSS agent advised that if LLE locates the person, the USSS will "speak" with him. It is also believed that this USSS agent did not widely transmit this information to any other USSS personnel.

Shortly after 6:09 p.m., an LLE officer decided to pursue the Shooter to determine what he was doing on the roof. With the assistance of another officer, he was hoisted up and observed the Shooter with an assault rifle which he pointed at the officer. Upon observing the rifle, the officer fell to the ground. He immediately shouted on his radio that the person on the AGR roof was armed with an assault rifle. Despite this transmission, this information was never relayed to President Trump's Security Detail. The failure to alert President Trump's Security Detail of this information impeded their ability to rush the stage prior to shots being fired.

At 6:11 p.m. the Shooter fired eight (8) shots at President Trump, one of which hit the President in his right ear, and another struck the Claimant's husband causing him and the Claimant to suffer severe, serious and grievous injuries as set forth herein. It was not until after eight shots were fired by the Shooter that a USSS counter-sniper returned fire and killed the would-be assassin with a single gunshot.

The shooting which resulted in Claimant's husband's and Claimant's severe, serious, permanent and grievous injuries was caused, in whole or in part, by the negligence, recklessness and/or carelessness of the United States of America, by and through the USSS, including, but not limited to, numerous USSS agents, whose identities are not yet known to the Claimant herein, in that said individuals and/or entities failed to provide adequate security to the attendees at the Butler Rally, specifically including to the Claimant's husband; failed to ensure that the AGR Buildings were secure despite their responsibilities to do so; failed to develop an adequate security plan; failed to implement an adequate security plan; failed to properly conduct advance planning at the site of the Butler Rally which exposed the attendees at the event to grave danger and resulted in the wounding of President Trump and two attendees (including Claimant's husband), and the death of another attendee; failed to mitigate line of sight dangers; failed to properly and adequately

7

communicate, brief, work with and/or assign LLE to ensure that the attendees at the Butler Rally were safe; failed to properly delineate and/or establish responsibilities between LLE and the USSS despite that it was the responsibility of the USSS to do so; failed to provide appropriate guidance to LLE concerning its responsibilities at the Butler Rally; improperly positioned USSS and LLE personnel throughout the Butler Rally including within the AGR Building which allowed the roof of the building to remain unsecured providing a prime sniper position for the Shooter; failed to secure and control the immediate airspace in the vicinity of the rally, and President Trump; failed to provide and/or utilize required and necessary technology, manpower and/or assets, including, but not limited to, the C-UAS which if properly employed – as was required – would have alerted the USSS that the Shooter operated a drone over the rally site hours before the shooting; failed to or inadequately trained the C-UAS operator such that the agent was unprepared for any technical failure(s) of the equipment; the C-UAS operator failed to test the equipment in advance of the rally to ensure that it was operational despite his responsibility to do so, particularly as he alerted others responsible for site security that the C-UAS *would* be used in the days leading up to the Butler Rally, creating dependence on a non-existent security asset on the day of the rally; failed to establish proper lines of communication; failed to adequately secure and protect the site of the Butler Rally (both "inside" and "outside" established perimeters); failed to secure, monitor and/or control a known and identified high-risk area immediately adjacent to the venue of the Butler Rally, specifically the AGR Building and grounds which, among other things, provided a potential gunman with a clear line of sight to the stage where President Trump was speaking and also provided an elevated position from which to fire shots; failed to communicate to specific members of President Trump's security detail prior to the President taking the stage that a suspicious individual was identified at the Butler Rally, including that a BOLO was issued for said individual who attempted to assassinate President Trump; failed to advise President Trump's Security Detail of the suspicious behavior of the Shooter after President Trump took the stage so that his security detail could immediately remove him from danger, thereby preventing the shooting; improperly assigned inexperienced and/or inadequately trained personnel to assignments involving significant security responsibilities for which they were inadequately trained, ill equipped and unable to carry out; violated numerous USSS policies and procedures, including, but not limited to, USSS Office of Protective Operations ("OPO") Manual OPO-3, OPO-6, OPO-8, SOD-08, the USSS Strategic Intelligence and Information Manual CSD-04, USSS Internal Operating Procedures: Counter Sniper Team Advance Procedures; and other Policy and Procedure Manuals and requirements; provided improper and inadequate training to USSS personnel assigned to the Butler Rally; improperly and inappropriately deferred significant security responsibilities to LLE without appropriate communication despite that it is, and was, the function and responsibility of the USSS to ensure that the Butler Rally was safe for all attendees; failed to ensure that USSS counter-sniper agents adequately covered the AGR Complex, especially because of the direct line of sight from that vantage point to the stage where President Trump spoke; even though they could not delegate ultimate responsibility, the USSS failed to specifically and/or adequately advise LLE that the security of AGR Complex was their responsibility if that was their intention; improperly allowed fragmented, broken and/or inadequate lines of communication to exist which severely impeded the transmission of critical safety and security information prior to the shooting;

8

improperly allowed separate command posts to be established which further precluded the timely dissemination of critical security information; improperly failed to centralize a single command center where information can be timely and appropriately disseminated to all personnel providing security; improperly allowed critically important safety communications to take place over cell phones as opposed to radio traffic which impeded and delayed the exchange of important security and safety information; the USSS's fragmented communication system prevented USSS personnel from sharing critical information timely and accurately to prevent the shooting, which, amongst other things, allowed certain USSS agents to be made aware of the Shooter but not others, while failing to widely and timely share this information; failed to specifically assign either USSS personnel and/or LLE personnel to the AGR Complex given its proximity and direct line of sight to the stage where President Trump spoke; improperly allowed LLE counter-sniper personnel to define their own roles and positions despite that it is the sole responsibility of the USSS to delineate and assign those responsibilities; improperly conducted advance site procedures including, but not limited to, walkthroughs to ensure that the AGR Complex was secure; improperly allowed LLE counter-snipers to be located within the AGR Building as opposed to securing the roof; was specifically aware, or should have been aware, that the roofs of buildings located within the AGR Complex were unsecure contrary to policy and procedure; improperly failed to assign a USSS counter-sniper team to monitor the AGR Complex, especially given its proximity to the event and direct line of sight to the stage; despite the USSS's mandate and ultimate responsibility for securing the site for the protectee and attendees of the event, the USSS utterly failed to develop and implement a proper security plan to protect all individuals at the Butler Rally; failed to mitigate a clear and direct line of sight to the stage contrary to policy and procedure; the USSS failed to adequately and timely transmit information to President Trump's Security Detail that would have either prevented President Trump from taking the stage or removed him from the stage prior to the time shots were fired; the USSS failed to share threat assessment information with the USSS agents responsible for site security at the Butler Rally; improperly missed several opportunities to detain the Shooter despite that it was known that he was acting in a highly suspicious manner well before the shooting; due to a lack of manpower, inexperienced personnel from agencies outside the USSS were given significant security responsibilities despite that they were inadequately trained to carry out those responsibilities; the security and site plan for the Butler Rally failed to define clear roles, responsibilities and a chain of command reporting structure; the USSS has ultimate responsibility for security planning at protective venues, including specifically the Butler Rally, and the USSS failed in this responsibility; the USSS failed to communicate with all LLE's that aided in site security for the Bulter Rally, and this failure allowed unacceptable gaps in the security that the USSS was required to provide; the site of the Butler Rally presented important line of sight concerns which were required to and could have been mitigated by the USSS, but the USSS failed to alleviate or mitigate these concerns; the USSS failed in key objectives of a site security plan and failed to conduct the necessary and required due diligence to make the site safe for attendees; the USSS failed in its primary objective of preventing direct line of sight sniper positions which were a known, clear and identifiable threat to a protectee; the USSS failed in its long-standing mission and failed to implement procedures learned from prior assassination attempts, including that the USSS failed to give heightened attention to certain buildings involving higher risk than others;

9

failed to deploy and utilize appropriate resources to protect a former president in advance planning even though the "[l]ack of adequate resources is an unacceptable excuse for failing to improve advance precautions in this crucial area of Presidential protection" (*See e.g.,* Warren Commission Report at Chapter 8); and/or the USSS committed other failures, and was otherwise negligent, reckless and/or careless, all of which, individually and/or jointly, in whole or in part, allowed a gunman to fire eight shots at President Trump from the roof of the AGR Building which severely, permanently and grievously injured the Claimant's husband, President Trump and others.

10. The instant claim is filed by and on behalf of the Claimant, Marianne Copenhaver, for all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, with no negligence on the part of the Claimant contributing thereto.

11. At the present time, witnesses include numerous individuals, including, but not limited to, presently unknown employees, agents, servants, and/or representatives of the USSS, including, the agents involved in the security work-up in advance of the Butler Rally, agents assigned to developing and implementing the site security plan for the Butler Rally, agents assigned to the Butler Rally on the day of the shooting, including, but not limited to, agents manning posts, agents assigned to the USSS Security Room, USSS counter-sniper personnel, and other USSS personnel, LLE officers and personnel who were involved in all of the foregoing activities in the days leading up to and on the day of the Butler Rally, and other LLE personnel, numerous eyewitnesses who observed some or all of the events set forth herein, any individual responsible for an investigation into the tragic events that unfolded at the Butler Rally including, but not limited to, USSS and LLE personnel, as well as members of Congress, aides and/or investigators, who were involved in any governmental investigation regarding the shooting, including those members who comprised and participated in the United States House of Representatives Task Force on the Attempted Assassination of President Trump which issued its Final Report dated December 5, 2024, which is incorporated herein by reference, as well as any Mission Assurance Review or After Action Reports conducted by the USSS or any other governmental agency; numerous first responders and others who responded to the scene of the shooting and rendered assistance, including, police, fire, emergency personnel, and others, all of whose identities are not yet known; other individuals who were present at the time of the shooting complained of herein whose identities are not yet known; the Claimant herein, her spouse, James Copenhaver, other members of the Claimant's family, friends, colleagues, and/or business associates, including, but not limited to, numerous individuals including current/former co-employees, professional colleagues; accountants; tax advisors;

10

financial advisors; all of the Claimant's medical providers that she has seen and will see as a result of the injuries her husband sustained in the shooting, and other family members, and other persons whose identities are presently unknown.

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Office of the Executive Secretary<br>MS 0525 Department of Homeland Security<br>2707 Martin Luther King Jr Ave SE<br>Washington, DC 20528-0525 | Marianne Copenhaver<br>c/o Speiser Krause PC<br>800 Westchester Avenue, Suite S-608<br>Rye Brook, New York 10573 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY  ☒ CIVILIAN | 4. DATE OF BIRTH<br>02/21/1951 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>07/13/2024     Saturday | 7. TIME (A.M. OR P.M.)<br>6:11 P.M. |
|---|---|---|---|---|

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attached Rider

**9.                                           PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

**10.                                    PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached Rider

**11.                                            WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See attached Rider | See attached Rider |

**12. (See instructions on reverse).                AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
|  | 30,000,000 |  | 30,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>*Marianne Copenhaver* | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>(724) 457-8087 | 14. DATE OF SIGNATURE<br>3-19-25 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

RIDER TO FORM 95

8.    The basis of this claim is under the Federal Tort Claims Act, 28 U.S.C. § 1346 and 28 U.S.C. § 2671, *et seq.*

This notice of claim is filed by and on behalf of the Claimant, Marianne Copenhaver (the "Claimant"). The instant claim is brought for all injuries sustained by Claimant as a result of her husband being shot and severely, permanently and grievously wounded on July 13, 2024, at approximately 6:11 P.M., while he was attending a presidential campaign rally located near Butler, Pennsylvania, at the Butler Farm Show Grounds (the "Butler Rally"), for then-candidate Former President of the United States of America Donald J. Trump (referred to as "President Trump"). Claimant seeks all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, at approximately 6:11 P.M., due to, in whole or in part, the negligence, recklessness and/or carelessness of the Department of Homeland Security, United States Secret Service (collectively referred to as "USSS"), its employees, agents, servants and/or representatives, including, federally-employed Secret Service Special Agents, and/or others, assigned to the Butler Rally to provide, amongst other things, security to ensure the safety of all persons in attendance at the Butler Rally, specifically including the Claimant's husband, and said individuals failed to provide required, proper, appropriate, timely and/or necessary security and/or other services and/or fulfill their responsibilities at the Butler Rally, and in advance of the Butler Rally, which failures proximately caused, in whole or in part, the shooting complained of herein. As a result of the shooting that occurred at the Butler Rally, Claimant's husband was severely, permanently, seriously and grievously injured, and as a result thereof, Claimant has suffered damages as set forth herein. Claimant's injuries are permanent in nature. The events which led to Claimant's husband being shot and his resulting grievous and permanent injuries were shocking and preventable, should not have happened, and the failures, as highlighted herein, exposed President Trump, and all Butler Rally attendees, specifically including the Claimant's husband, to grave, mortal danger.[1]

On and prior to July 13, 2024, the United States of America, through the USSS, was responsible for, amongst other things, providing security and/or developing and implementing an appropriate site security plan at Presidential campaign events, specifically including at the Butler Rally, to ensure the safety of all attendees at the event, including, but not limited to, preventing a shooting and/or assassination attempt. These responsibilities were even more acute at the Butler Rally since the campaign event involved the leading candidate and former President of the United States who had been the subject

---

[1] A separate SF-95 ("Form 95") is being filed on behalf of the Claimant's spouse, Mr. James Copenhaver for his severe, serious, grievous, and permanent injuries as a result of the shooting complained of herein.

1

of death threats. In addition, in providing required security and protective services at such events including, but not limited to, the Butler Rally, the USSS is required to abide by and adhere to various policies and procedures specifically designed to mitigate risk and ensure the safety of all event attendees. As highlighted herein, the USSS violated and breached various applicable policies and procedures and failed to provide adequate security, including failing to implement and execute an appropriate security plan, which, individually and/or collectively, in whole or in part, allowed and proximately caused the shooting complained of herein which resulted in Claimant's husband's serious, severe, grievous and permanent physical, mental, economic and other injuries, and in turn caused the Claimant to suffer damages as set forth herein.

All of the foregoing is based upon information and belief and is not intended as a complete encapsulation of all facts leading up to the shooting complained of herein. However, the failures that occurred on July 13, 2024, and in the days preceding the campaign event were rampant, unacceptable and were clear violations of directives, procedures, protocol, and mandated standards and caused, in whole or in part, the shooting and Claimant and her husband's injuries as set forth herein.

Briefly, on July 2, 2024, the Secret Service assigned to President Trump (referred to as the "Trump Security Detail") notified the USSS, specifically including the USSS's Pittsburgh Field Office, regarding a potential campaign stop in Pennsylvania tentatively scheduled for July 13, 2024. At that time, the Pittsburgh Field Office began assigning personnel to this potential visit. The public was informed the following day that President Trump would make a campaign stop in western Pennsylvania. On July 4, 2024, the Trump Security Detail advised the USSS that the event on July 13, 2024, identified herein as the Butler Rally, would take place at the Butler Farm Show Grounds located near Butler, Pennsylvania.

The Butler Farm Show Grounds are a vast property consisting of more than 100 acres. Although the property itself is privately owned, the land is available for public use with at least seven entrances that are open to the public. Advance planning for the Butler Rally began on July 5, 2024, when the USSS sent an email to various state and local law enforcement agencies and counterparts (collectively referred to as "LLE"), inviting them to a meeting on July 8, 2024, to discuss the event.

On the morning of July 8, 2024, the USSS conducted a "walk through" of the Butler Farm Show Grounds with numerous individuals, including President Trump's campaign staff, where several security items were discussed, including, where the stage will be located as well as line of sight mitigation to prevent any attempted assassination of President Trump.

Later that same day, LLE personnel conducted their own meeting where security was also discussed, including, the site, security perimeter and the route that President Trump's motorcade would take to and from the Butler Rally. At that time, LLE was provided with USSS contact information to discuss a "telephonic" advance meeting.

2

On July 9, 2024, the USSS met with LLE including representatives from the Pennsylvania State Police ("PSP"), and this meeting specifically included a discussion of the AGR Complex (a building and grounds located on the Butler Farm Grounds). This meeting reflects the first of numerous critical communication failures between the USSS and LLE. During a subsequent government investigation into the assassination attempt of President Trump at the Butler Rally, USSS advised that it believed that LLE and PSP were responsible for "locking down" and securing the AGR site. The PSP and LLE refuted that assertion advising that PSP recalled no discussion that it was responsible for the AGR Complex, and that PSP was not asked to cover the AGR Building. This unacceptable lack of understanding set in motion the events that allowed an individual by the name of Thomas Crooks (the "Shooter" or "gunman") to climb onto the roof of the AGR Building which in turn, allowed him to fire eight shots at President Trump, one of which severely, permanently and grievously injured the Claimant's husband, resulting in her damages as set forth herein.

On July 10, 2024, the USSS conducted another walkthrough of the event site to undertake a workforce assessment for site security. Purportedly, the AGR Building and complex was discussed, and the USSS advance personnel claim that they were advised, amongst other things, that LLE would provide police, patrol cars, and counter-sniper teams and that there would be various obstructions of line of sight from the AGR Complex to the stage where President Trump was to speak. Despite that the AGR Complex was discussed during this walkthrough, there was a stunning lack of communication and coordination as to which agency would secure the AGR Complex despite that the security for the event ultimately rests with the USSS.[2]

On July 11, 2024, the USSS met again with LLE at the site of the Butler Rally. Line of sight mitigation issues were purportedly discussed at this time, including with President Trump's Security Detail. Additional communication failures resulting in security lapses apparently occurred at this meeting, and thereafter. The USSS believed that LLE and PSP would provide more patrol and a heightened police presence around the AGR Complex; LLE and PSP apparently advised that they did not have the resources to do that. In addition, this was the last meeting between the USSS and LLE concerning site security.

The next day, July 12, 2024, USSS met with President Trump's campaign staff. Line of sight mitigation from the AGR Complex to the stage was again discussed, including possibly placing large farm equipment between the AGR Building and stage to mitigate these concerns. Also, on this date, LLE completed its site plan for the event, but it was not sent to the USSS nor did the USSS ask to *see or review* the plan. This is yet another extraordinary failure on the part of the USSS given that ultimate site security is its responsibility.

---

[2] Making this failure more grievous is the fact that the unsecured AGR rooftop was a clear and significant security risk with a previously identified short range line of sight sniper position directly to the podium from which President Trump would be delivering his remarks.

3

The Butler Rally took place the following day on July 13, 2024. Prior to the event, as highlighted herein, the security failures were rampant, including, but not limited to, the failure on the part of the USSS to communicate and properly delineate and define appropriate security responsibilities, establish and implement an appropriate site security plan, mitigate line of sight concerns, etc. Gaps in the security plan were evident including that there was no confirmation by the USSS as to who was to secure and protect the AGR Complex notwithstanding its proximity to the event and the direct line of site to the stage where President Trump was to address the rally. Although discussed in the days leading up to the event, no line of sight mitigation efforts occurred between the AGR Complex and the stage from which President Trump was to address the rally's attendees. These failures are the responsibility of the USSS as it is ultimately responsible for *all* site security and the safety of those in attendance including the Claimant's husband.

Notwithstanding the failures leading up to the event, the failures on the day of the event compounded the prior failures and directly led, in whole or in part, to the shooting in which Claimant's husband was grievously injured. In the hours leading up to the event, LLE conducted its own security meeting, and the USSS did likewise. Stunningly, no one from the USSS attended the LLE security briefing leading to further confusion and a misunderstanding of security responsibilities and communication methods and protocols.

On the day of the event, USSS set up a communication and command center on the rally grounds (the "USSS Security Room" or "Security Room"). Contrary to policy and procedure, and notwithstanding that LLE was delegated by the USSS to provide, amongst other things, site security, no LLE personnel were located within the USSS Security Room. Rather, only a representative from the PSP was located within and in direct contact with agents of the USSS in the Security Room. In addition, and also contrary to policy and procedure, LLE set up its own separate command center in a trailer on the property which was not staffed by USSS personnel. These separate command centers resulted in fragmented and improper communication between LLE, PSP and the USSS, and these communication failures were critical on the day of the rally, especially in the moments leading up to the shooting. Moreover, contrary to policy and procedure, the USSS had a complete misunderstanding concerning the LLE command center. The USSS believed that the trailer was to be used only for medical emergencies and line of sight mitigation – not a critical communications post where vital information concerning site security was shared. Also, radio communication failures had occurred within the LLE trailer, which required an individual in the trailer to communicate with the PSP representative who was located within the USSS Security Room by cellular telephone.

Technology failures on July 13, 2024, were not limited to radio communications. As part of its security responsibilities, the USSS employs a counter-unmanned aerial system (C-UAS) to monitor drone activity at a particular event. The C-UAS is an unmanned drone which can detect if another drone is being used to surveil an event. If the C-UAS detects other drone activity, an alert is sent to the USSS which advises USSS agents that a drone has been detected, and it can provide the location of the drone pilot who could then be

4

questioned by USSS personnel. It is also believed that the day prior to the event, the USSS advised LLE that certain of its officers would likewise receive an alert from the C-UAS to assist in investigating any suspicious drone activity.

However, on the morning of the Butler Rally, the C-UAS was determined to be inoperative and astonishingly, the C-UAS operator spent most of the morning and early afternoon on the phone with the manufacturer's "800 number" to troubleshoot the issue. The USSS agent responsible for the operation of the C-UAS did not test the system since it was last used nor did he have any spare parts to fix the unit. The C-UAS did not become operable until approximately 4:30 p.m. on the day of the event.

While the C-UAS was inoperative, and at 3:51 p.m., the Shooter flew a drone over the rally site for close to 12 minutes. This allowed the Shooter to view the stage, podium, and surrounding area where President Trump was going to speak. If the C-UAS was operational when the Shooter operated his drone, which it should have been, the C-UAS would have detected this and notified the USSS and others of the location of the Shooter almost two and one-half hours prior to the shooting. USSS personnel could then have interviewed the Shooter at that time, and this likely would have prevented the shooting and Claimant's resulting injuries. The C-UAS ultimately became operable at approximately 4:30 p.m., but by this time, it was too late as the Shooter had already completed his drone surveillance.

Unacceptable radio communication issues also persisted throughout the hours before the shooting. As a result, the USSS advised its agents standing posts that they should switch to a different radio channel to assure better communications. This further resulted in fragmented and inappropriate lines of communication within the USSS itself as well as with LLE and PSP.

At approximately 4:30 p.m., President Trump's aircraft landed in Pennsylvania, and he arrived at the site of the Butler Rally at a little after 5:30 p.m. However, prior to this and at approximately 5:00 p.m., LLE officers noticed the Shooter acting erratically, and his behavior raised suspicion. It is believed that this assessment was made independently by various LLE personnel, but these suspicions were not communicated to the USSS at that time, in part, due to the above-mentioned communication issues. Apparently, the USSS's site security plan failed to include required common communication channels so that all agencies were aware of issues involving a potentially dangerous individual. Shortly thereafter, LLE took pictures of the Shooter and circulated those pictures to other LLE personnel.

At around 5:10 p.m., the Shooter was again seen by LLE personnel, but this time, the Shooter was observed using a *range finder* from his position near the AGR Complex to the stage. As a result, LLE appropriately began an active search for the Shooter. One LLE officer observed the Shooter via binoculars moving in and out of sight by the AGR Complex. LLE continued their active search for the Shooter until about 5:40 p.m. At this time, an LLE officer texted several LLE counter-snipers advising them of the Shooter and further advised that those individuals could notify the USSS of this suspicious individual.

5

By no later than 5:51 p.m. (approximately 20 minutes before the shooting), certain USSS agents were aware of the Shooter including his prior movements and description. Despite this knowledge, and contrary to policy and procedure, this information was not widely disseminated to other USSS personnel. Moreover, given the other inoperable and fragmented methods of communication between LLE and the USSS, the USSS agents assigned to the Security Room were not previously aware of the suspicious behavior exhibited by the Shooter.

By 5:42 p.m., an LLE counter sniper advised individuals in the LLE trailer about the Shooter, including his description and the fact that he previously was using a range finder. Shortly thereafter, LLE contacted the PSP officer located in the USSS Security Room via cell phone to advise of the Shooter. The LLE caller heard the PSP officer discussing this information with others in the USSS Security Room. This information was also shared by LLE with USSS counter sniper personnel which included a "Be on the Lookout" ("BOLO") for the Shooter. Regardless, as mentioned above, by no later than 5:51 p.m., the USSS Security Room had received photos of the Shooter.

Moreover, despite that the USSS was specifically aware of the Shooter and his extraordinarily suspicious behavior, at no time was this information passed along to President Trump's Security Detail (the individuals who most acutely needed to be aware of this information) or anyone near the stage, nor was this information relayed to other USSS personnel responsible for site security.

Shortly after 5:51 p.m., the Shooter was again observed near the AGR Complex, but no LLE or USSS personnel were in the vicinity. It was at this same time that certain LLE personnel then observed the Shooter "running". This information was put out over the LLE radio system, and LLE was searching for the Shooter again. Between 6:00 p.m. and 6:09 p.m., several USSS agents (including senior USSS personnel) entered the USSS Security Room. Despite that the information regarding the Shooter made its way to the USSS Security Room no later than 5:51 p.m., these agents who began entering at 6:00 p.m. and after were not advised or made aware that an active search was ongoing for a suspicious individual identified as the Shooter.

Approximately 6 minutes prior to the shooting, the Shooter climbed onto the roof of a Building located in the AGR Complex by scaling air conditioning units located near the roof, with a weapon. Several bystanders saw the Shooter do this, and they attempted to advise LLE of the Shooter's presence on the roof. The Shooter was observed moving across multiple roofs of buildings within the AGR Complex from 6:05 p.m. through 6:08 p.m. However, given the USSS failures as highlighted herein, no one was actually assigned to monitor the roof of buildings located at the AGR Complex. This was especially egregious and contrary to USSS policy and procedure, given that the roof allowed a direct line of sight to the stage where President Trump was to speak, and the USSS knew and had discussed this risk on numerous occasions but blatantly failed to mitigate these line of sight concerns.

6

In the approximate three minutes before the shooting, an LLE officer approached the AGR Complex and observed the Shooter on the roof. No USSS personnel were observed in the vicinity of the AGR Buildings.

The approaching officer then radioed other LLE personnel advising that an individual was on the roof of an AGR Building. Given the USSS's failure to establish a cohesive, integrated and common line of communication, this specific transmission never made its way to the USSS.

However, by 6:09 p.m. – after President Trump had already taken the stage and approximately two minutes before the shooting - the USSS Security Room *was* aware of a suspicious individual on the roof of an AGR Building. This is known because LLE called the PSP officer in the USSS Security Room via cellular telephone to advise him of this information. In addition, slightly before the LLE phone call to PSP regarding a person on the AGR roof, a USSS agent staffing a post was made aware of a suspicious person lurking around the AGR Complex. It is believed that this USSS agent advised that if LLE locates the person, the USSS will "speak" with him. It is also believed that this USSS agent did not widely transmit this information to any other USSS personnel.

Shortly after 6:09 p.m., an LLE officer decided to pursue the Shooter to determine what he was doing on the roof. With the assistance of another officer, he was hoisted up and observed the Shooter with an assault rifle which he pointed at the officer. Upon observing the rifle, the officer fell to the ground. He immediately shouted on his radio that the person on the AGR roof was armed with an assault rifle. Despite this transmission, this information was never relayed to President Trump's Security Detail. The failure to alert President Trump's Security Detail of this information impeded their ability to rush the stage prior to shots being fired.

At 6:11 p.m. the Shooter fired eight (8) shots at President Trump, one of which hit the President in his right ear, and another struck the Claimant's husband causing him and the Claimant to suffer severe, serious and grievous injuries as set forth herein. It was not until after eight shots were fired by the Shooter that a USSS counter-sniper returned fire and killed the would-be assassin with a single gunshot.

The shooting which resulted in Claimant's husband's and Claimant's severe, serious, permanent and grievous injuries was caused, in whole or in part, by the negligence, recklessness and/or carelessness of the United States of America, by and through the USSS, including, but not limited to, numerous USSS agents, whose identities are not yet known to the Claimant herein, in that said individuals and/or entities failed to provide adequate security to the attendees at the Butler Rally, specifically including to the Claimant's husband; failed to ensure that the AGR Buildings were secure despite their responsibilities to do so; failed to develop an adequate security plan; failed to implement an adequate security plan; failed to properly conduct advance planning at the site of the Butler Rally which exposed the attendees at the event to grave danger and resulted in the wounding of President Trump and two attendees (including Claimant's husband), and the death of another attendee; failed to mitigate line of sight dangers; failed to properly and adequately

7

communicate, brief, work with and/or assign LLE to ensure that the attendees at the Butler Rally were safe; failed to properly delineate and/or establish responsibilities between LLE and the USSS despite that it was the responsibility of the USSS to do so; failed to provide appropriate guidance to LLE concerning its responsibilities at the Butler Rally; improperly positioned USSS and LLE personnel throughout the Butler Rally including within the AGR Building which allowed the roof of the building to remain unsecured providing a prime sniper position for the Shooter; failed to secure and control the immediate airspace in the vicinity of the rally, and President Trump; failed to provide and/or utilize required and necessary technology, manpower and/or assets, including, but not limited to, the C-UAS which if properly employed – as was required – would have alerted the USSS that the Shooter operated a drone over the rally site hours before the shooting; failed to or inadequately trained the C-UAS operator such that the agent was unprepared for any technical failure(s) of the equipment; the C-UAS operator failed to test the equipment in advance of the rally to ensure that it was operational despite his responsibility to do so, particularly as he alerted others responsible for site security that the C-UAS *would* be used in the days leading up to the Butler Rally, creating dependence on a non-existent security asset on the day of the rally; failed to establish proper lines of communication; failed to adequately secure and protect the site of the Butler Rally (both "inside" and "outside" established perimeters); failed to secure, monitor and/or control a known and identified high-risk area immediately adjacent to the venue of the Butler Rally, specifically the AGR Building and grounds which, among other things, provided a potential gunman with a clear line of sight to the stage where President Trump was speaking and also provided an elevated position from which to fire shots; failed to communicate to specific members of President Trump's security detail prior to the President taking the stage that a suspicious individual was identified at the Butler Rally, including that a BOLO was issued for said individual who attempted to assassinate President Trump; failed to advise President Trump's Security Detail of the suspicious behavior of the Shooter after President Trump took the stage so that his security detail could immediately remove him from danger, thereby preventing the shooting; improperly assigned inexperienced and/or inadequately trained personnel to assignments involving significant security responsibilities for which they were inadequately trained, ill equipped and unable to carry out; violated numerous USSS policies and procedures, including, but not limited to, USSS Office of Protective Operations ("OPO") Manual OPO-3, OPO-6, OPO-8, SOD-08, the USSS Strategic Intelligence and Information Manual CSD-04, USSS Internal Operating Procedures: Counter Sniper Team Advance Procedures; and other Policy and Procedure Manuals and requirements; provided improper and inadequate training to USSS personnel assigned to the Butler Rally; improperly and inappropriately deferred significant security responsibilities to LLE without appropriate communication despite that it is, and was, the function and responsibility of the USSS to ensure that the Butler Rally was safe for all attendees; failed to ensure that USSS counter-sniper agents adequately covered the AGR Complex, especially because of the direct line of sight from that vantage point to the stage where President Trump spoke; even though they could not delegate ultimate responsibility, the USSS failed to specifically and/or adequately advise LLE that the security of AGR Complex was their responsibility if that was their intention; improperly allowed fragmented, broken and/or inadequate lines of communication to exist which severely impeded the transmission of critical safety and security information prior to the shooting;

8

improperly allowed separate command posts to be established which further precluded the timely dissemination of critical security information; improperly failed to centralize a single command center where information can be timely and appropriately disseminated to all personnel providing security; improperly allowed critically important safety communications to take place over cell phones as opposed to radio traffic which impeded and delayed the exchange of important security and safety information; the USSS's fragmented communication system prevented USSS personnel from sharing critical information timely and accurately to prevent the shooting, which, amongst other things, allowed certain USSS agents to be made aware of the Shooter but not others, while failing to widely and timely share this information; failed to specifically assign either USSS personnel and/or LLE personnel to the AGR Complex given its proximity and direct line of sight to the stage where President Trump spoke; improperly allowed LLE counter-sniper personnel to define their own roles and positions despite that it is the sole responsibility of the USSS to delineate and assign those responsibilities; improperly conducted advance site procedures including, but not limited to, walkthroughs to ensure that the AGR Complex was secure; improperly allowed LLE counter-snipers to be located within the AGR Building as opposed to securing the roof; was specifically aware, or should have been aware, that the roofs of buildings located within the AGR Complex were unsecure contrary to policy and procedure; improperly failed to assign a USSS counter-sniper team to monitor the AGR Complex, especially given its proximity to the event and direct line of sight to the stage; despite the USSS's mandate and ultimate responsibility for securing the site for the protectee and attendees of the event, the USSS utterly failed to develop and implement a proper security plan to protect all individuals at the Butler Rally; failed to mitigate a clear and direct line of sight to the stage contrary to policy and procedure; the USSS failed to adequately and timely transmit information to President Trump's Security Detail that would have either prevented President Trump from taking the stage or removed him from the stage prior to the time shots were fired; the USSS failed to share threat assessment information with the USSS agents responsible for site security at the Butler Rally; improperly missed several opportunities to detain the Shooter despite that it was known that he was acting in a highly suspicious manner well before the shooting; due to a lack of manpower, inexperienced personnel from agencies outside the USSS were given significant security responsibilities despite that they were inadequately trained to carry out those responsibilities; the security and site plan for the Butler Rally failed to define clear roles, responsibilities and a chain of command reporting structure; the USSS has ultimate responsibility for security planning at protective venues, including specifically the Butler Rally, and the USSS failed in this responsibility; the USSS failed to communicate with all LLE's that aided in site security for the Bulter Rally, and this failure allowed unacceptable gaps in the security that the USSS was required to provide; the site of the Butler Rally presented important line of sight concerns which were required to and could have been mitigated by the USSS, but the USSS failed to alleviate or mitigate these concerns; the USSS failed in key objectives of a site security plan and failed to conduct the necessary and required due diligence to make the site safe for attendees; the USSS failed in its primary objective of preventing direct line of sight sniper positions which were a known, clear and identifiable threat to a protectee; the USSS failed in its long-standing mission and failed to implement procedures learned from prior assassination attempts, including that the USSS failed to give heightened attention to certain buildings involving higher risk than others;

9

failed to deploy and utilize appropriate resources to protect a former president in advance planning even though the "[l]ack of adequate resources is an unacceptable excuse for failing to improve advance precautions in this crucial area of Presidential protection" (*See e.g.,* Warren Commission Report at Chapter 8); and/or the USSS committed other failures, and was otherwise negligent, reckless and/or careless, all of which, individually and/or jointly, in whole or in part, allowed a gunman to fire eight shots at President Trump from the roof of the AGR Building which severely, permanently and grievously injured the Claimant's husband, President Trump and others.

10. The instant claim is filed by and on behalf of the Claimant, Marianne Copenhaver, for all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, with no negligence on the part of the Claimant contributing thereto.

11. At the present time, witnesses include numerous individuals, including, but not limited to, presently unknown employees, agents, servants, and/or representatives of the USSS, including, the agents involved in the security work-up in advance of the Butler Rally, agents assigned to developing and implementing the site security plan for the Butler Rally, agents assigned to the Butler Rally on the day of the shooting, including, but not limited to, agents manning posts, agents assigned to the USSS Security Room, USSS counter-sniper personnel, and other USSS personnel, LLE officers and personnel who were involved in all of the foregoing activities in the days leading up to and on the day of the Butler Rally, and other LLE personnel, numerous eyewitnesses who observed some or all of the events set forth herein, any individual responsible for an investigation into the tragic events that unfolded at the Butler Rally including, but not limited to, USSS and LLE personnel, as well as members of Congress, aides and/or investigators, who were involved in any governmental investigation regarding the shooting, including those members who comprised and participated in the United States House of Representatives Task Force on the Attempted Assassination of President Trump which issued its Final Report dated December 5, 2024, which is incorporated herein by reference, as well as any Mission Assurance Review or After Action Reports conducted by the USSS or any other governmental agency; numerous first responders and others who responded to the scene of the shooting and rendered assistance, including, police, fire, emergency personnel, and others, all of whose identities are not yet known; other individuals who were present at the time of the shooting complained of herein whose identities are not yet known; the Claimant herein, her spouse, James Copenhaver, other members of the Claimant's family, friends, colleagues, and/or business associates, including, but not limited to, numerous individuals including current/former co-employees, professional colleagues; accountants; tax advisors;

financial advisors; all of the Claimant's medical providers that she has seen and will see as a result of the injuries her husband sustained in the shooting, and other family members, and other persons whose identities are presently unknown.

ORIGIN ID:CTXA          (914) 220-5333
DOUGLAS A. LATTO
SPEISER KRAUSE
800 WESTCHESTER AVE
SUITE S-608
RYE BROOK, NY 10573
UNITED STATES US

SHIP DATE: 31MAR25
ACTWGT: 1.00 LB
CAD: 9286652/INET4535

TO OFFICE OF THE EXECUTIVE SECRETARY
MS 0525 DEPT. OF HOMELAND SECURITY
2707 MARTIN LUTHER KING JR AVE SE

WASHINGTON DC 20528

(202) 282-8000
INV:
PO:                REF: COPENHAVER (M)
                   DEPT:

BILL SENDER

TRK# 8802 0597 6164
0201

EP RDVA

TUE - 01 APR 5:00P
STANDARD OVERNIGHT

DC-US    IAD

DSR
20528

FedEx Express
J251024121701uv

58CJ3/459E/C6C4

---

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



ORIGIN ID:RDVA              (202) 282-8000
OFFICE OF THE EXECUTIVE SECRETARY
MS 0525 DEPT. OF HOMELAND SECURITY
2707 MARTIN LUTHER KING JR AVE SE

WASHINGTON, DC 20528
UNITED STATES US

TO DOUGLAS A. LATTO
SPEISER KRAUSE
800 WESTCHESTER AVE
SUITE S-608
RYE BROOK NY 10573

(914) 220-5333
INV:
PO:                    REF: COPENHAVER (M)

RMA:                   DEPT:

SHIP DATE: 31MAR25
ACTWGT: 0.50 LB
CAD: 9266652/INET14535

58CJ3/459E/C6C4

TRK# 7917 0182 6251
0221

NY-US

RETURNS MON-FRI
** 2DAY **

10573

J25102412170luv

FedEx Express

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

FedEx.

April 01, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 880205976164

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Shipping/Receiving |
| **Signed for by:** | R.Gill | **Delivery Location:** | 2707 MARTIN LUTHER KING JR AVE SE |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday; Direct Signature Required | | WASHINGTON, DC, 20528 |
| | | **Delivery date:** | Apr 1, 2025 10:09 |

---

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 880205976164 | **Ship Date:** | Mar 31, 2025 |
| | | **Weight:** | 0.5 LB/0.23 KG |

**Recipient:**
Office of the Executive Secretary, MS 0525 Dept. of Homeland Security
2707 MARTIN LUTHER KING JR AVE SE
WASHINGTON, DC, US, 20528

**Shipper:**
Douglas A. Latto, Speiser Krause
800 Westchester Ave
Suite S-608
RYE BROOK, NY, US, 10573

**Reference**                    Copenhaver (M)

Signature Proof of Delivery is not currently available for this Tracking Number.  Availability of signature

images may take up to 5 days after delivery date. Please try later, or contact Customer Service at

1.800.Go.FedEx(R) 800.463.3339.

Thank you for choosing FedEx

# SPEISER KRAUSE

### COUNSELLORS AT LAW

*800 Westchester Avenue*
*Suite South 608*
*Rye Brook, New York 10573*

PHONE: (914) 220-5333  FAX: (914) 220-5334

WWW.SPEISERKRAUSE.COM

5555 GLENRIDGE CONNECTOR
SUITE 550
ATLANTA, GA 30342
T: (404) 751-0632
F: (866) 936-6382

2617 HUNTINGDON PIKE
SUITE 101
HUNTINGDON VALLEY, PA 19006
T: (215) 884-8190
F: (215) 884-8266

# 70
*years*   March 31, 2025

*VIA FEDERAL EXPRESS*

United States Secret Service
245 Murray Ln SW – BLDG T-5
Washington, DC 20223

> Re:   Marianne Copenhaver
> Shooting at the Presidential Rally in Butler, PA
> Date of Incident: July 13, 2024

Dir Sir/Madam:

This office, along with the Law Offices of Max Feldman, have been retained by Mrs. Marianne Copenhaver in connection with the above-captioned matter. In this regard, enclosed please find an original and one (1) copy of the Claim for Damage, Injury, or Death, Standard Form 95 ("Form 95") due to the injuries Mrs. Copenhaver sustained as a result of the above-referenced incident.

Would you be so kind as to file the original Form 95 enclosed herein, date-stamp the copy indicating that the Form 95 has been received by your office and return the date-stamped copy to me in the enclosed federal express envelope.

Thank you for your courtesy and consideration in this regard. Of course, if you need additional information, please contact me.

Very truly yours,

Douglas A. Latto

DAL:klv
Enclosures
cc:   Joseph Feldman, Esq.
Nicholas Feldman, Esq.

ADDITIONAL OFFICE LOCATIONS: LONG ISLAND, NY AND METROPOLITAN DC

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States Secret Service<br>245 Murray Ln SW - BLDG T-5<br>Washington, D.C. 20223 | Marianne Copenhaver<br>c/o Speiser Krause PC<br>800 Westchester Avenue, Suite S-608<br>Rye Brook, New York 10573 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 02/21/1951 | Married | 07/13/2024 | Saturday | 6:11 P.M. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attached Rider

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached Rider

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| See attached Rider | See attached Rider |

12. (See instructions on reverse).    AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| | 30,000,000 | | 30,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *Marianne Copenhaver* | (724) 457-8087 | 3·17·25 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

<u>RIDER TO FORM 95</u>

8.    The basis of this claim is under the Federal Tort Claims Act, 28 U.S.C. § 1346 and 28 U.S.C. § 2671, *et seq.*

This notice of claim is filed by and on behalf of the Claimant, Marianne Copenhaver (the "Claimant"). The instant claim is brought for all injuries sustained by Claimant as a result of her husband being shot and severely, permanently and grievously wounded on July 13, 2024, at approximately 6:11 P.M., while he was attending a presidential campaign rally located near Butler, Pennsylvania, at the Butler Farm Show Grounds (the "Butler Rally"), for then-candidate Former President of the United States of America Donald J. Trump (referred to as "President Trump"). Claimant seeks all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, at approximately 6:11 P.M., due to, in whole or in part, the negligence, recklessness and/or carelessness of the United States Secret Service ("USSS"), its employees, agents, servants and/or representatives, including, federally-employed Secret Service Special Agents, and/or others, assigned to the Butler Rally to provide, amongst other things, security to ensure the safety of all persons in attendance at the Butler Rally, specifically including the Claimant's husband, and said individuals failed to provide required, proper, appropriate, timely and/or necessary security and/or other services and/or fulfill their responsibilities at the Butler Rally, and in advance of the Butler Rally, which failures proximately caused, in whole or in part, the shooting complained of herein. As a result of the shooting that occurred at the Butler Rally, Claimant's husband was severely, permanently, seriously and grievously injured, and as a result thereof, Claimant has suffered damages as set forth herein. Claimant's injuries are permanent in nature. The events which led to Claimant's husband being shot and his resulting grievous and permanent injuries were shocking and preventable, should not have happened, and the failures, as highlighted herein, exposed President Trump, and all Butler Rally attendees, specifically including the Claimant's husband, to grave, mortal danger.[1]

On and prior to July 13, 2024, the United States of America, through the USSS, was responsible for, amongst other things, providing security and/or developing and implementing an appropriate site security plan at Presidential campaign events, specifically including at the Butler Rally, to ensure the safety of all attendees at the event, including, but not limited to, preventing a shooting and/or assassination attempt. These responsibilities were even more acute at the Butler Rally since the campaign event involved the leading candidate and former President of the United States who had been the subject

---

[1] A separate SF-95 ("Form 95") is being filed on behalf of the Claimant's spouse, Mr. James Copenhaver for his severe, serious, grievous, and permanent injuries as a result of the shooting complained of herein.

1

of death threats. In addition, in providing required security and protective services at such events including, but not limited to, the Butler Rally, the USSS is required to abide by and adhere to various policies and procedures specifically designed to mitigate risk and ensure the safety of all event attendees. As highlighted herein, the USSS violated and breached various applicable policies and procedures and failed to provide adequate security, including failing to implement and execute an appropriate security plan, which, individually and/or collectively, in whole or in part, allowed and proximately caused the shooting complained of herein which resulted in Claimant's husband's serious, severe, grievous and permanent physical, mental, economic and other injuries, and in turn caused the Claimant to suffer damages as set forth herein.

All of the foregoing is based upon information and belief and is not intended as a complete encapsulation of all facts leading up to the shooting complained of herein. However, the failures that occurred on July 13, 2024, and in the days preceding the campaign event were rampant, unacceptable and were clear violations of directives, procedures, protocol, and mandated standards and caused, in whole or in part, the shooting and Claimant and her husband's injuries as set forth herein.

Briefly, on July 2, 2024, the Secret Service assigned to President Trump (referred to as the "Trump Security Detail") notified the USSS, specifically including the USSS's Pittsburgh Field Office, regarding a potential campaign stop in Pennsylvania tentatively scheduled for July 13, 2024. At that time, the Pittsburgh Field Office began assigning personnel to this potential visit. The public was informed the following day that President Trump would make a campaign stop in western Pennsylvania. On July 4, 2024, the Trump Security Detail advised the USSS that the event on July 13, 2024, identified herein as the Butler Rally, would take place at the Butler Farm Show Grounds located near Butler, Pennsylvania.

The Butler Farm Show Grounds are a vast property consisting of more than 100 acres. Although the property itself is privately owned, the land is available for public use with at least seven entrances that are open to the public. Advance planning for the Butler Rally began on July 5, 2024, when the USSS sent an email to various state and local law enforcement agencies and counterparts (collectively referred to as "LLE"), inviting them to a meeting on July 8, 2024, to discuss the event.

On the morning of July 8, 2024, the USSS conducted a "walk through" of the Butler Farm Show Grounds with numerous individuals, including President Trump's campaign staff, where several security items were discussed, including, where the stage will be located as well as line of sight mitigation to prevent any attempted assassination of President Trump.

Later that same day, LLE personnel conducted their own meeting where security was also discussed, including, the site, security perimeter and the route that President Trump's motorcade would take to and from the Butler Rally. At that time, LLE was provided with USSS contact information to discuss a "telephonic" advance meeting.

2

On July 9, 2024, the USSS met with LLE including representatives from the Pennsylvania State Police ("PSP"), and this meeting specifically included a discussion of the AGR Complex (a building and grounds located on the Butler Farm Grounds). This meeting reflects the first of numerous critical communication failures between the USSS and LLE. During a subsequent government investigation into the assassination attempt of President Trump at the Butler Rally, USSS advised that it believed that LLE and PSP were responsible for "locking down" and securing the AGR site. The PSP and LLE refuted that assertion advising that PSP recalled no discussion that it was responsible for the AGR Complex, and that PSP was not asked to cover the AGR Building. This unacceptable lack of understanding set in motion the events that allowed an individual by the name of Thomas Crooks (the "Shooter" or "gunman") to climb onto the roof of the AGR Building which in turn, allowed him to fire eight shots at President Trump, one of which severely, permanently and grievously injured the Claimant's husband, resulting in her damages as set forth herein.

On July 10, 2024, the USSS conducted another walkthrough of the event site to undertake a workforce assessment for site security. Purportedly, the AGR Building and complex was discussed, and the USSS advance personnel claim that they were advised, amongst other things, that LLE would provide police, patrol cars, and counter-sniper teams and that there would be various obstructions of line of sight from the AGR Complex to the stage where President Trump was to speak. Despite that the AGR Complex was discussed during this walkthrough, there was a stunning lack of communication and coordination as to which agency would secure the AGR Complex despite that the security for the event ultimately rests with the USSS.[2]

On July 11, 2024, the USSS met again with LLE at the site of the Butler Rally. Line of sight mitigation issues were purportedly discussed at this time, including with President Trump's Security Detail. Additional communication failures resulting in security lapses apparently occurred at this meeting, and thereafter. The USSS believed that LLE and PSP would provide more patrol and a heightened police presence around the AGR Complex; LLE and PSP apparently advised that they did not have the resources to do that. In addition, this was the last meeting between the USSS and LLE concerning site security.

The next day, July 12, 2024, USSS met with President Trump's campaign staff. Line of sight mitigation from the AGR Complex to the stage was again discussed, including possibly placing large farm equipment between the AGR Building and stage to mitigate these concerns. Also, on this date, LLE completed its site plan for the event, but it was not sent to the USSS nor did the USSS ask to *see or review* the plan. This is yet another extraordinary failure on the part of the USSS given that ultimate site security is its responsibility.

---

[2] Making this failure more grievous is the fact that the unsecured AGR rooftop was a clear and significant security risk with a previously identified short range line of sight sniper position directly to the podium from which President Trump would be delivering his remarks.

3

The Butler Rally took place the following day on July 13, 2024. Prior to the event, as highlighted herein, the security failures were rampant, including, but not limited to, the failure on the part of the USSS to communicate and properly delineate and define appropriate security responsibilities, establish and implement an appropriate site security plan, mitigate line of sight concerns, etc. Gaps in the security plan were evident including that there was no confirmation by the USSS as to who was to secure and protect the AGR Complex notwithstanding its proximity to the event and the direct line of site to the stage where President Trump was to address the rally. Although discussed in the days leading up to the event, no line of sight mitigation efforts occurred between the AGR Complex and the stage from which President Trump was to address the rally's attendees. These failures are the responsibility of the USSS as it is ultimately responsible for *all* site security and the safety of those in attendance including the Claimant's husband.

Notwithstanding the failures leading up to the event, the failures on the day of the event compounded the prior failures and directly led, in whole or in part, to the shooting in which Claimant's husband was grievously injured. In the hours leading up to the event, LLE conducted its own security meeting, and the USSS did likewise. Stunningly, no one from the USSS attended the LLE security briefing leading to further confusion and a misunderstanding of security responsibilities and communication methods and protocols.

On the day of the event, USSS set up a communication and command center on the rally grounds (the "USSS Security Room" or "Security Room"). Contrary to policy and procedure, and notwithstanding that LLE was delegated by the USSS to provide, amongst other things, site security, no LLE personnel were located within the USSS Security Room. Rather, only a representative from the PSP was located within and in direct contact with agents of the USSS in the Security Room. In addition, and also contrary to policy and procedure, LLE set up its own separate command center in a trailer on the property which was not staffed by USSS personnel. These separate command centers resulted in fragmented and improper communication between LLE, PSP and the USSS, and these communication failures were critical on the day of the rally, especially in the moments leading up to the shooting. Moreover, contrary to policy and procedure, the USSS had a complete misunderstanding concerning the LLE command center. The USSS believed that the trailer was to be used only for medical emergencies and line of sight mitigation – not a critical communications post where vital information concerning site security was shared. Also, radio communication failures had occurred within the LLE trailer, which required an individual in the trailer to communicate with the PSP representative who was located within the USSS Security Room by cellular telephone.

Technology failures on July 13, 2024, were not limited to radio communications. As part of its security responsibilities, the USSS employs a counter-unmanned aerial system (C-UAS) to monitor drone activity at a particular event. The C-UAS is an unmanned drone which can detect if another drone is being used to surveil an event. If the C-UAS detects other drone activity, an alert is sent to the USSS which advises USSS agents that a drone has been detected, and it can provide the location of the drone pilot who could then be

4

questioned by USSS personnel. It is also believed that the day prior to the event, the USSS advised LLE that certain of its officers would likewise receive an alert from the C-UAS to assist in investigating any suspicious drone activity.

However, on the morning of the Butler Rally, the C-UAS was determined to be inoperative and astonishingly, the C-UAS operator spent most of the morning and early afternoon on the phone with the manufacturer's "800 number" to troubleshoot the issue. The USSS agent responsible for the operation of the C-UAS did not test the system since it was last used nor did he have any spare parts to fix the unit. The C-UAS did not become operable until approximately 4:30 p.m. on the day of the event.

While the C-UAS was inoperative, and at 3:51 p.m., the Shooter flew a drone over the rally site for close to 12 minutes. This allowed the Shooter to view the stage, podium, and surrounding area where President Trump was going to speak. If the C-UAS was operational when the Shooter operated his drone, which it should have been, the C-UAS would have detected this and notified the USSS and others of the location of the Shooter almost two and one-half hours prior to the shooting. USSS personnel could then have interviewed the Shooter at that time, and this likely would have prevented the shooting and Claimant's resulting injuries. The C-UAS ultimately became operable at approximately 4:30 p.m., but by this time, it was too late as the Shooter had already completed his drone surveillance.

Unacceptable radio communication issues also persisted throughout the hours before the shooting. As a result, the USSS advised its agents standing posts that they should switch to a different radio channel to assure better communications. This further resulted in fragmented and inappropriate lines of communication within the USSS itself as well as with LLE and PSP.

At approximately 4:30 p.m., President Trump's aircraft landed in Pennsylvania, and he arrived at the site of the Butler Rally at a little after 5:30 p.m. However, prior to this and at approximately 5:00 p.m., LLE officers noticed the Shooter acting erratically, and his behavior raised suspicion. It is believed that this assessment was made independently by various LLE personnel, but these suspicions were not communicated to the USSS at that time, in part, due to the above-mentioned communication issues. Apparently, the USSS's site security plan failed to include required common communication channels so that all agencies were aware of issues involving a potentially dangerous individual. Shortly thereafter, LLE took pictures of the Shooter and circulated those pictures to other LLE personnel.

At around 5:10 p.m., the Shooter was again seen by LLE personnel, but this time, the Shooter was observed using a *range finder* from his position near the AGR Complex to the stage. As a result, LLE appropriately began an active search for the Shooter. One LLE officer observed the Shooter via binoculars moving in and out of sight by the AGR Complex. LLE continued their active search for the Shooter until about 5:40 p.m. At this time, an LLE officer texted several LLE counter-snipers advising them of the Shooter and further advised that those individuals could notify the USSS of this suspicious individual.

5

By no later than 5:51 p.m. (approximately 20 minutes before the shooting), certain USSS agents were aware of the Shooter including his prior movements and description. Despite this knowledge, and contrary to policy and procedure, this information was not widely disseminated to other USSS personnel. Moreover, given the other inoperable and fragmented methods of communication between LLE and the USSS, the USSS agents assigned to the Security Room were not previously aware of the suspicious behavior exhibited by the Shooter.

By 5:42 p.m., an LLE counter sniper advised individuals in the LLE trailer about the Shooter, including his description and the fact that he previously was using a range finder. Shortly thereafter, LLE contacted the PSP officer located in the USSS Security Room via cell phone to advise of the Shooter. The LLE caller heard the PSP officer discussing this information with others in the USSS Security Room. This information was also shared by LLE with USSS counter sniper personnel which included a "Be on the Lookout" ("BOLO") for the Shooter. Regardless, as mentioned above, by no later than 5:51 p.m., the USSS Security Room had received photos of the Shooter.

Moreover, despite that the USSS was specifically aware of the Shooter and his extraordinarily suspicious behavior, at no time was this information passed along to President Trump's Security Detail (the individuals who most acutely needed to be aware of this information) or anyone near the stage, nor was this information relayed to other USSS personnel responsible for site security.

Shortly after 5:51 p.m., the Shooter was again observed near the AGR Complex, but no LLE or USSS personnel were in the vicinity. It was at this same time that certain LLE personnel then observed the Shooter "running". This information was put out over the LLE radio system, and LLE was searching for the Shooter again. Between 6:00 p.m. and 6:09 p.m., several USSS agents (including senior USSS personnel) entered the USSS Security Room. Despite that the information regarding the Shooter made its way to the USSS Security Room no later than 5:51 p.m., these agents who began entering at 6:00 p.m. and after were not advised or made aware that an active search was ongoing for a suspicious individual identified as the Shooter.

Approximately 6 minutes prior to the shooting, the Shooter climbed onto the roof of a Building located in the AGR Complex by scaling air conditioning units located near the roof, with a weapon. Several bystanders saw the Shooter do this, and they attempted to advise LLE of the Shooter's presence on the roof. The Shooter was observed moving across multiple roofs of buildings within the AGR Complex from 6:05 p.m. through 6:08 p.m. However, given the USSS failures as highlighted herein, no one was actually assigned to monitor the roof of buildings located at the AGR Complex. This was especially egregious and contrary to USSS policy and procedure, given that the roof allowed a direct line of sight to the stage where President Trump was to speak, and the USSS knew and had discussed this risk on numerous occasions but blatantly failed to mitigate these line of sight concerns.

6

In the approximate three minutes before the shooting, an LLE officer approached the AGR Complex and observed the Shooter on the roof. No USSS personnel were observed in the vicinity of the AGR Buildings.

The approaching officer then radioed other LLE personnel advising that an individual was on the roof of an AGR Building. Given the USSS's failure to establish a cohesive, integrated and common line of communication, this specific transmission never made its way to the USSS.

However, by 6:09 p.m. – after President Trump had already taken the stage and approximately two minutes before the shooting - the USSS Security Room *was* aware of a suspicious individual on the roof of an AGR Building. This is known because LLE called the PSP officer in the USSS Security Room via cellular telephone to advise him of this information. In addition, slightly before the LLE phone call to PSP regarding a person on the AGR roof, a USSS agent staffing a post was made aware of a suspicious person lurking around the AGR Complex. It is believed that this USSS agent advised that if LLE locates the person, the USSS will "speak" with him. It is also believed that this USSS agent did not widely transmit this information to any other USSS personnel.

Shortly after 6:09 p.m., an LLE officer decided to pursue the Shooter to determine what he was doing on the roof. With the assistance of another officer, he was hoisted up and observed the Shooter with an assault rifle which he pointed at the officer. Upon observing the rifle, the officer fell to the ground. He immediately shouted on his radio that the person on the AGR roof was armed with an assault rifle. Despite this transmission, this information was never relayed to President Trump's Security Detail. The failure to alert President Trump's Security Detail of this information impeded their ability to rush the stage prior to shots being fired.

At 6:11 p.m. the Shooter fired eight (8) shots at President Trump, one of which hit the President in his right ear, and another struck the Claimant's husband causing him and the Claimant to suffer severe, serious and grievous injuries as set forth herein. It was not until after eight shots were fired by the Shooter that a USSS counter-sniper returned fire and killed the would-be assassin with a single gunshot.

The shooting which resulted in Claimant's husband's and Claimant's severe, serious, permanent and grievous injuries was caused, in whole or in part, by the negligence, recklessness and/or carelessness of the United States of America, by and through the USSS, including, but not limited to, numerous USSS agents, whose identities are not yet known to the Claimant herein, in that said individuals and/or entities failed to provide adequate security to the attendees at the Butler Rally, specifically including to the Claimant's husband; failed to ensure that the AGR Buildings were secure despite their responsibilities to do so; failed to develop an adequate security plan; failed to implement an adequate security plan; failed to properly conduct advance planning at the site of the Butler Rally which exposed the attendees at the event to grave danger and resulted in the wounding of President Trump and two attendees (including Claimant's husband), and the death of another attendee; failed to mitigate line of sight dangers; failed to properly and adequately

7

communicate, brief, work with and/or assign LLE to ensure that the attendees at the Butler Rally were safe; failed to properly delineate and/or establish responsibilities between LLE and the USSS despite that it was the responsibility of the USSS to do so; failed to provide appropriate guidance to LLE concerning its responsibilities at the Butler Rally; improperly positioned USSS and LLE personnel throughout the Butler Rally including within the AGR Building which allowed the roof of the building to remain unsecured providing a prime sniper position for the Shooter; failed to secure and control the immediate airspace in the vicinity of the rally, and President Trump; failed to provide and/or utilize required and necessary technology, manpower and/or assets, including, but not limited to, the C-UAS which if properly employed – as was required – would have alerted the USSS that the Shooter operated a drone over the rally site hours before the shooting; failed to or inadequately trained the C-UAS operator such that the agent was unprepared for any technical failure(s) of the equipment; the C-UAS operator failed to test the equipment in advance of the rally to ensure that it was operational despite his responsibility to do so, particularly as he alerted others responsible for site security that the C-UAS *would* be used in the days leading up to the Butler Rally, creating dependence on a non-existent security asset on the day of the rally; failed to establish proper lines of communication; failed to adequately secure and protect the site of the Butler Rally (both "inside" and "outside" established perimeters); failed to secure, monitor and/or control a known and identified high-risk area immediately adjacent to the venue of the Butler Rally, specifically the AGR Building and grounds which, among other things, provided a potential gunman with a clear line of sight to the stage where President Trump was speaking and also provided an elevated position from which to fire shots; failed to communicate to specific members of President Trump's security detail prior to the President taking the stage that a suspicious individual was identified at the Butler Rally, including that a BOLO was issued for said individual who attempted to assassinate President Trump; failed to advise President Trump's Security Detail of the suspicious behavior of the Shooter after President Trump took the stage so that his security detail could immediately remove him from danger, thereby preventing the shooting; improperly assigned inexperienced and/or inadequately trained personnel to assignments involving significant security responsibilities for which they were inadequately trained, ill equipped and unable to carry out; violated numerous USSS policies and procedures, including, but not limited to, USSS Office of Protective Operations ("OPO") Manual OPO-3, OPO-6, OPO-8, SOD-08, the USSS Strategic Intelligence and Information Manual CSD-04, USSS Internal Operating Procedures: Counter Sniper Team Advance Procedures; and other Policy and Procedure Manuals and requirements; provided improper and inadequate training to USSS personnel assigned to the Butler Rally; improperly and inappropriately deferred significant security responsibilities to LLE without appropriate communication despite that it is, and was, the function and responsibility of the USSS to ensure that the Butler Rally was safe for all attendees; failed to ensure that USSS counter-sniper agents adequately covered the AGR Complex, especially because of the direct line of sight from that vantage point to the stage where President Trump spoke; even though they could not delegate ultimate responsibility, the USSS failed to specifically and/or adequately advise LLE that the security of AGR Complex was their responsibility if that was their intention; improperly allowed fragmented, broken and/or inadequate lines of communication to exist which severely impeded the transmission of critical safety and security information prior to the shooting;

8

improperly allowed separate command posts to be established which further precluded the timely dissemination of critical security information; improperly failed to centralize a single command center where information can be timely and appropriately disseminated to all personnel providing security; improperly allowed critically important safety communications to take place over cell phones as opposed to radio traffic which impeded and delayed the exchange of important security and safety information; the USSS's fragmented communication system prevented USSS personnel from sharing critical information timely and accurately to prevent the shooting, which, amongst other things, allowed certain USSS agents to be made aware of the Shooter but not others, while failing to widely and timely share this information; failed to specifically assign either USSS personnel and/or LLE personnel to the AGR Complex given its proximity and direct line of sight to the stage where President Trump spoke; improperly allowed LLE counter-sniper personnel to define their own roles and positions despite that it is the sole responsibility of the USSS to delineate and assign those responsibilities; improperly conducted advance site procedures including, but not limited to, walkthroughs to ensure that the AGR Complex was secure; improperly allowed LLE counter-snipers to be located within the AGR Building as opposed to securing the roof; was specifically aware, or should have been aware, that the roofs of buildings located within the AGR Complex were unsecure contrary to policy and procedure; improperly failed to assign a USSS counter-sniper team to monitor the AGR Complex, especially given its proximity to the event and direct line of sight to the stage; despite the USSS's mandate and ultimate responsibility for securing the site for the protectee and attendees of the event, the USSS utterly failed to develop and implement a proper security plan to protect all individuals at the Butler Rally; failed to mitigate a clear and direct line of sight to the stage contrary to policy and procedure; the USSS failed to adequately and timely transmit information to President Trump's Security Detail that would have either prevented President Trump from taking the stage or removed him from the stage prior to the time shots were fired; the USSS failed to share threat assessment information with the USSS agents responsible for site security at the Butler Rally; improperly missed several opportunities to detain the Shooter despite that it was known that he was acting in a highly suspicious manner well before the shooting; due to a lack of manpower, inexperienced personnel from agencies outside the USSS were given significant security responsibilities despite that they were inadequately trained to carry out those responsibilities; the security and site plan for the Butler Rally failed to define clear roles, responsibilities and a chain of command reporting structure; the USSS has ultimate responsibility for security planning at protective venues, including specifically the Butler Rally, and the USSS failed in this responsibility; the USSS failed to communicate with all LLE's that aided in site security for the Bulter Rally, and this failure allowed unacceptable gaps in the security that the USSS was required to provide; the site of the Butler Rally presented important line of sight concerns which were required to and could have been mitigated by the USSS, but the USSS failed to alleviate or mitigate these concerns; the USSS failed in key objectives of a site security plan and failed to conduct the necessary and required due diligence to make the site safe for attendees; the USSS failed in its primary objective of preventing direct line of sight sniper positions which were a known, clear and identifiable threat to a protectee; the USSS failed in its long-standing mission and failed to implement procedures learned from prior assassination attempts, including that the USSS failed to give heightened attention to certain buildings involving higher risk than others;

9

failed to deploy and utilize appropriate resources to protect a former president in advance planning even though the "[l]ack of adequate resources is an unacceptable excuse for failing to improve advance precautions in this crucial area of Presidential protection" (*See e.g.,* Warren Commission Report at Chapter 8); and/or the USSS committed other failures, and was otherwise negligent, reckless and/or careless, all of which, individually and/or jointly, in whole or in part, allowed a gunman to fire eight shots at President Trump from the roof of the AGR Building which severely, permanently and grievously injured the Claimant's husband, President Trump and others.

10.    The instant claim is filed by and on behalf of the Claimant, Marianne Copenhaver, for all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, with no negligence on the part of the Claimant contributing thereto.

11.    At the present time, witnesses include numerous individuals, including, but not limited to, presently unknown employees, agents, servants, and/or representatives of the USSS, including, the agents involved in the security work-up in advance of the Butler Rally, agents assigned to developing and implementing the site security plan for the Butler Rally, agents assigned to the Butler Rally on the day of the shooting, including, but not limited to, agents manning posts, agents assigned to the USSS Security Room, USSS counter-sniper personnel, and other USSS personnel, LLE officers and personnel who were involved in all of the foregoing activities in the days leading up to and on the day of the Butler Rally, and other LLE personnel, numerous eyewitnesses who observed some or all of the events set forth herein, any individual responsible for an investigation into the tragic events that unfolded at the Butler Rally including, but not limited to, USSS and LLE personnel, as well as members of Congress, aides and/or investigators, who were involved in any governmental investigation regarding the shooting, including those members who comprised and participated in the United States House of Representatives Task Force on the Attempted Assassination of President Trump which issued its Final Report dated December 5, 2024, which is incorporated herein by reference, as well as any Mission Assurance Review or After Action Reports conducted by the USSS or any other governmental agency; numerous first responders and others who responded to the scene of the shooting and rendered assistance, including, police, fire, emergency personnel, and others, all of whose identities are not yet known; other individuals who were present at the time of the shooting complained of herein whose identities are not yet known; the Claimant herein, her spouse, James Copenhaver, other members of the Claimant's family, friends, colleagues, and/or business associates, including, but not limited to, numerous individuals including current/former co-employees, professional colleagues; accountants; tax advisors;

10

financial advisors; all of the Claimant's medical providers that she has seen and will see as a result of the injuries her husband sustained in the shooting, and other family members, and other persons whose identities are presently unknown.

11

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States Secret Service<br>245 Murray Ln SW - BLDG T-5<br>Washington, D.C. 20223 | Marianne Copenhaver<br>c/o Speiser Krause PC<br>800 Westchester Avenue, Suite S-608<br>Rye Brook, New York 10573 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY  ☒ CIVILIAN | 4. DATE OF BIRTH<br>02/21/1951 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>07/13/2024    Saturday | 7. TIME (A.M. OR P.M.)<br>6:11 P.M. |
|---|---|---|---|---|

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attached Rider

**9.    PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

**10.    PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached Rider

**11.    WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See attached Rider | See attached Rider |

**12.** (See instructions on reverse).    **AMOUNT OF CLAIM** (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
|  | 30,000,000 |  | 30,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>*Marianne Copenhaver* | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>(724) 457-8087 | 14. DATE OF SIGNATURE<br>3-17-25 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## RIDER TO FORM 95

8.    The basis of this claim is under the Federal Tort Claims Act, 28 U.S.C. § 1346 and 28 U.S.C. § 2671, *et seq.*

This notice of claim is filed by and on behalf of the Claimant, Marianne Copenhaver (the "Claimant"). The instant claim is brought for all injuries sustained by Claimant as a result of her husband being shot and severely, permanently and grievously wounded on July 13, 2024, at approximately 6:11 P.M., while he was attending a presidential campaign rally located near Butler, Pennsylvania, at the Butler Farm Show Grounds (the "Butler Rally"), for then-candidate Former President of the United States of America Donald J. Trump (referred to as "President Trump"). Claimant seeks all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, at approximately 6:11 P.M., due to, in whole or in part, the negligence, recklessness and/or carelessness of the United States Secret Service ("USSS"), its employees, agents, servants and/or representatives, including, federally-employed Secret Service Special Agents, and/or others, assigned to the Butler Rally to provide, amongst other things, security to ensure the safety of all persons in attendance at the Butler Rally, specifically including the Claimant's husband, and said individuals failed to provide required, proper, appropriate, timely and/or necessary security and/or other services and/or fulfill their responsibilities at the Butler Rally, and in advance of the Butler Rally, which failures proximately caused, in whole or in part, the shooting complained of herein. As a result of the shooting that occurred at the Butler Rally, Claimant's husband was severely, permanently, seriously and grievously injured, and as a result thereof, Claimant has suffered damages as set forth herein. Claimant's injuries are permanent in nature. The events which led to Claimant's husband being shot and his resulting grievous and permanent injuries were shocking and preventable, should not have happened, and the failures, as highlighted herein, exposed President Trump, and all Butler Rally attendees, specifically including the Claimant's husband, to grave, mortal danger.[1]

On and prior to July 13, 2024, the United States of America, through the USSS, was responsible for, amongst other things, providing security and/or developing and implementing an appropriate site security plan at Presidential campaign events, specifically including at the Butler Rally, to ensure the safety of all attendees at the event, including, but not limited to, preventing a shooting and/or assassination attempt. These responsibilities were even more acute at the Butler Rally since the campaign event involved the leading candidate and former President of the United States who had been the subject

---

[1] A separate SF-95 ("Form 95") is being filed on behalf of the Claimant's spouse, Mr. James Copenhaver for his severe, serious, grievous, and permanent injuries as a result of the shooting complained of herein.

1

of death threats. In addition, in providing required security and protective services at such events including, but not limited to, the Butler Rally, the USSS is required to abide by and adhere to various policies and procedures specifically designed to mitigate risk and ensure the safety of all event attendees. As highlighted herein, the USSS violated and breached various applicable policies and procedures and failed to provide adequate security, including failing to implement and execute an appropriate security plan, which, individually and/or collectively, in whole or in part, allowed and proximately caused the shooting complained of herein which resulted in Claimant's husband's serious, severe, grievous and permanent physical, mental, economic and other injuries, and in turn caused the Claimant to suffer damages as set forth herein.

All of the foregoing is based upon information and belief and is not intended as a complete encapsulation of all facts leading up to the shooting complained of herein. However, the failures that occurred on July 13, 2024, and in the days preceding the campaign event were rampant, unacceptable and were clear violations of directives, procedures, protocol, and mandated standards and caused, in whole or in part, the shooting and Claimant and her husband's injuries as set forth herein.

Briefly, on July 2, 2024, the Secret Service assigned to President Trump (referred to as the "Trump Security Detail") notified the USSS, specifically including the USSS's Pittsburgh Field Office, regarding a potential campaign stop in Pennsylvania tentatively scheduled for July 13, 2024. At that time, the Pittsburgh Field Office began assigning personnel to this potential visit. The public was informed the following day that President Trump would make a campaign stop in western Pennsylvania. On July 4, 2024, the Trump Security Detail advised the USSS that the event on July 13, 2024, identified herein as the Butler Rally, would take place at the Butler Farm Show Grounds located near Butler, Pennsylvania.

The Butler Farm Show Grounds are a vast property consisting of more than 100 acres. Although the property itself is privately owned, the land is available for public use with at least seven entrances that are open to the public. Advance planning for the Butler Rally began on July 5, 2024, when the USSS sent an email to various state and local law enforcement agencies and counterparts (collectively referred to as "LLE"), inviting them to a meeting on July 8, 2024, to discuss the event.

On the morning of July 8, 2024, the USSS conducted a "walk through" of the Butler Farm Show Grounds with numerous individuals, including President Trump's campaign staff, where several security items were discussed, including, where the stage will be located as well as line of sight mitigation to prevent any attempted assassination of President Trump.

Later that same day, LLE personnel conducted their own meeting where security was also discussed, including, the site, security perimeter and the route that President Trump's motorcade would take to and from the Butler Rally. At that time, LLE was provided with USSS contact information to discuss a "telephonic" advance meeting.

2

On July 9, 2024, the USSS met with LLE including representatives from the Pennsylvania State Police ("PSP"), and this meeting specifically included a discussion of the AGR Complex (a building and grounds located on the Butler Farm Grounds). This meeting reflects the first of numerous critical communication failures between the USSS and LLE. During a subsequent government investigation into the assassination attempt of President Trump at the Butler Rally, USSS advised that it believed that LLE and PSP were responsible for "locking down" and securing the AGR site. The PSP and LLE refuted that assertion advising that PSP recalled no discussion that it was responsible for the AGR Complex, and that PSP was not asked to cover the AGR Building. This unacceptable lack of understanding set in motion the events that allowed an individual by the name of Thomas Crooks (the "Shooter" or "gunman") to climb onto the roof of the AGR Building which in turn, allowed him to fire eight shots at President Trump, one of which severely, permanently and grievously injured the Claimant's husband, resulting in her damages as set forth herein.

On July 10, 2024, the USSS conducted another walkthrough of the event site to undertake a workforce assessment for site security. Purportedly, the AGR Building and complex was discussed, and the USSS advance personnel claim that they were advised, amongst other things, that LLE would provide police, patrol cars, and counter-sniper teams and that there would be various obstructions of line of sight from the AGR Complex to the stage where President Trump was to speak. Despite that the AGR Complex was discussed during this walkthrough, there was a stunning lack of communication and coordination as to which agency would secure the AGR Complex despite that the security for the event ultimately rests with the USSS.[2]

On July 11, 2024, the USSS met again with LLE at the site of the Butler Rally. Line of sight mitigation issues were purportedly discussed at this time, including with President Trump's Security Detail. Additional communication failures resulting in security lapses apparently occurred at this meeting, and thereafter. The USSS believed that LLE and PSP would provide more patrol and a heightened police presence around the AGR Complex; LLE and PSP apparently advised that they did not have the resources to do that. In addition, this was the last meeting between the USSS and LLE concerning site security.

The next day, July 12, 2024, USSS met with President Trump's campaign staff. Line of sight mitigation from the AGR Complex to the stage was again discussed, including possibly placing large farm equipment between the AGR Building and stage to mitigate these concerns. Also, on this date, LLE completed its site plan for the event, but it was not sent to the USSS nor did the USSS ask to *see or review* the plan. This is yet another extraordinary failure on the part of the USSS given that ultimate site security is its responsibility.

---

[2] Making this failure more grievous is the fact that the unsecured AGR rooftop was a clear and significant security risk with a previously identified short range line of sight sniper position directly to the podium from which President Trump would be delivering his remarks.

3

The Butler Rally took place the following day on July 13, 2024. Prior to the event, as highlighted herein, the security failures were rampant, including, but not limited to, the failure on the part of the USSS to communicate and properly delineate and define appropriate security responsibilities, establish and implement an appropriate site security plan, mitigate line of sight concerns, etc. Gaps in the security plan were evident including that there was no confirmation by the USSS as to who was to secure and protect the AGR Complex notwithstanding its proximity to the event and the direct line of site to the stage where President Trump was to address the rally. Although discussed in the days leading up to the event, no line of sight mitigation efforts occurred between the AGR Complex and the stage from which President Trump was to address the rally's attendees. These failures are the responsibility of the USSS as it is ultimately responsible for *all* site security and the safety of those in attendance including the Claimant's husband.

Notwithstanding the failures leading up to the event, the failures on the day of the event compounded the prior failures and directly led, in whole or in part, to the shooting in which Claimant's husband was grievously injured. In the hours leading up to the event, LLE conducted its own security meeting, and the USSS did likewise. Stunningly, no one from the USSS attended the LLE security briefing leading to further confusion and a misunderstanding of security responsibilities and communication methods and protocols.

On the day of the event, USSS set up a communication and command center on the rally grounds (the "USSS Security Room" or "Security Room"). Contrary to policy and procedure, and notwithstanding that LLE was delegated by the USSS to provide, amongst other things, site security, no LLE personnel were located within the USSS Security Room. Rather, only a representative from the PSP was located within and in direct contact with agents of the USSS in the Security Room. In addition, and also contrary to policy and procedure, LLE set up its own separate command center in a trailer on the property which was not staffed by USSS personnel. These separate command centers resulted in fragmented and improper communication between LLE, PSP and the USSS, and these communication failures were critical on the day of the rally, especially in the moments leading up to the shooting. Moreover, contrary to policy and procedure, the USSS had a complete misunderstanding concerning the LLE command center. The USSS believed that the trailer was to be used only for medical emergencies and line of sight mitigation – not a critical communications post where vital information concerning site security was shared. Also, radio communication failures had occurred within the LLE trailer, which required an individual in the trailer to communicate with the PSP representative who was located within the USSS Security Room by cellular telephone.

Technology failures on July 13, 2024, were not limited to radio communications. As part of its security responsibilities, the USSS employs a counter-unmanned aerial system (C-UAS) to monitor drone activity at a particular event. The C-UAS is an unmanned drone which can detect if another drone is being used to surveil an event. If the C-UAS detects other drone activity, an alert is sent to the USSS which advises USSS agents that a drone has been detected, and it can provide the location of the drone pilot who could then be

4

questioned by USSS personnel. It is also believed that the day prior to the event, the USSS advised LLE that certain of its officers would likewise receive an alert from the C-UAS to assist in investigating any suspicious drone activity.

However, on the morning of the Butler Rally, the C-UAS was determined to be inoperative and astonishingly, the C-UAS operator spent most of the morning and early afternoon on the phone with the manufacturer's "800 number" to troubleshoot the issue. The USSS agent responsible for the operation of the C-UAS did not test the system since it was last used nor did he have any spare parts to fix the unit. The C-UAS did not become operable until approximately 4:30 p.m. on the day of the event.

While the C-UAS was inoperative, and at 3:51 p.m., the Shooter flew a drone over the rally site for close to 12 minutes. This allowed the Shooter to view the stage, podium, and surrounding area where President Trump was going to speak. If the C-UAS was operational when the Shooter operated his drone, which it should have been, the C-UAS would have detected this and notified the USSS and others of the location of the Shooter almost two and one-half hours prior to the shooting. USSS personnel could then have interviewed the Shooter at that time, and this likely would have prevented the shooting and Claimant's resulting injuries. The C-UAS ultimately became operable at approximately 4:30 p.m., but by this time, it was too late as the Shooter had already completed his drone surveillance.

Unacceptable radio communication issues also persisted throughout the hours before the shooting. As a result, the USSS advised its agents standing posts that they should switch to a different radio channel to assure better communications. This further resulted in fragmented and inappropriate lines of communication within the USSS itself as well as with LLE and PSP.

At approximately 4:30 p.m., President Trump's aircraft landed in Pennsylvania, and he arrived at the site of the Butler Rally at a little after 5:30 p.m. However, prior to this and at approximately 5:00 p.m., LLE officers noticed the Shooter acting erratically, and his behavior raised suspicion. It is believed that this assessment was made independently by various LLE personnel, but these suspicions were not communicated to the USSS at that time, in part, due to the above-mentioned communication issues. Apparently, the USSS's site security plan failed to include required common communication channels so that all agencies were aware of issues involving a potentially dangerous individual. Shortly thereafter, LLE took pictures of the Shooter and circulated those pictures to other LLE personnel.

At around 5:10 p.m., the Shooter was again seen by LLE personnel, but this time, the Shooter was observed using a *range finder* from his position near the AGR Complex to the stage. As a result, LLE appropriately began an active search for the Shooter. One LLE officer observed the Shooter via binoculars moving in and out of sight by the AGR Complex. LLE continued their active search for the Shooter until about 5:40 p.m. At this time, an LLE officer texted several LLE counter-snipers advising them of the Shooter and further advised that those individuals could notify the USSS of this suspicious individual.

5

By no later than 5:51 p.m. (approximately 20 minutes before the shooting), certain USSS agents were aware of the Shooter including his prior movements and description. Despite this knowledge, and contrary to policy and procedure, this information was not widely disseminated to other USSS personnel. Moreover, given the other inoperable and fragmented methods of communication between LLE and the USSS, the USSS agents assigned to the Security Room were not previously aware of the suspicious behavior exhibited by the Shooter.

By 5:42 p.m., an LLE counter sniper advised individuals in the LLE trailer about the Shooter, including his description and the fact that he previously was using a range finder. Shortly thereafter, LLE contacted the PSP officer located in the USSS Security Room via cell phone to advise of the Shooter. The LLE caller heard the PSP officer discussing this information with others in the USSS Security Room. This information was also shared by LLE with USSS counter sniper personnel which included a "Be on the Lookout" ("BOLO") for the Shooter. Regardless, as mentioned above, by no later than 5:51 p.m., the USSS Security Room had received photos of the Shooter.

Moreover, despite that the USSS was specifically aware of the Shooter and his extraordinarily suspicious behavior, at no time was this information passed along to President Trump's Security Detail (the individuals who most acutely needed to be aware of this information) or anyone near the stage, nor was this information relayed to other USSS personnel responsible for site security.

Shortly after 5:51 p.m., the Shooter was again observed near the AGR Complex, but no LLE or USSS personnel were in the vicinity. It was at this same time that certain LLE personnel then observed the Shooter "running". This information was put out over the LLE radio system, and LLE was searching for the Shooter again. Between 6:00 p.m. and 6:09 p.m., several USSS agents (including senior USSS personnel) entered the USSS Security Room. Despite that the information regarding the Shooter made its way to the USSS Security Room no later than 5:51 p.m., these agents who began entering at 6:00 p.m. and after were not advised or made aware that an active search was ongoing for a suspicious individual identified as the Shooter.

Approximately 6 minutes prior to the shooting, the Shooter climbed onto the roof of a Building located in the AGR Complex by scaling air conditioning units located near the roof, with a weapon. Several bystanders saw the Shooter do this, and they attempted to advise LLE of the Shooter's presence on the roof. The Shooter was observed moving across multiple roofs of buildings within the AGR Complex from 6:05 p.m. through 6:08 p.m. However, given the USSS failures as highlighted herein, no one was actually assigned to monitor the roof of buildings located at the AGR Complex. This was especially egregious and contrary to USSS policy and procedure, given that the roof allowed a direct line of sight to the stage where President Trump was to speak, and the USSS knew and had discussed this risk on numerous occasions but blatantly failed to mitigate these line of sight concerns.

In the approximate three minutes before the shooting, an LLE officer approached the AGR Complex and observed the Shooter on the roof. No USSS personnel were observed in the vicinity of the AGR Buildings.

The approaching officer then radioed other LLE personnel advising that an individual was on the roof of an AGR Building. Given the USSS's failure to establish a cohesive, integrated and common line of communication, this specific transmission never made its way to the USSS.

However, by 6:09 p.m. – after President Trump had already taken the stage and approximately two minutes before the shooting - the USSS Security Room *was* aware of a suspicious individual on the roof of an AGR Building. This is known because LLE called the PSP officer in the USSS Security Room via cellular telephone to advise him of this information. In addition, slightly before the LLE phone call to PSP regarding a person on the AGR roof, a USSS agent staffing a post was made aware of a suspicious person lurking around the AGR Complex. It is believed that this USSS agent advised that if LLE locates the person, the USSS will "speak" with him. It is also believed that this USSS agent did not widely transmit this information to any other USSS personnel.

Shortly after 6:09 p.m., an LLE officer decided to pursue the Shooter to determine what he was doing on the roof. With the assistance of another officer, he was hoisted up and observed the Shooter with an assault rifle which he pointed at the officer. Upon observing the rifle, the officer fell to the ground. He immediately shouted on his radio that the person on the AGR roof was armed with an assault rifle. Despite this transmission, this information was never relayed to President Trump's Security Detail. The failure to alert President Trump's Security Detail of this information impeded their ability to rush the stage prior to shots being fired.

At 6:11 p.m. the Shooter fired eight (8) shots at President Trump, one of which hit the President in his right ear, and another struck the Claimant's husband causing him and the Claimant to suffer severe, serious and grievous injuries as set forth herein. It was not until after eight shots were fired by the Shooter that a USSS counter-sniper returned fire and killed the would-be assassin with a single gunshot.

The shooting which resulted in Claimant's husband's and Claimant's severe, serious, permanent and grievous injuries was caused, in whole or in part, by the negligence, recklessness and/or carelessness of the United States of America, by and through the USSS, including, but not limited to, numerous USSS agents, whose identities are not yet known to the Claimant herein, in that said individuals and/or entities failed to provide adequate security to the attendees at the Butler Rally, specifically including to the Claimant's husband; failed to ensure that the AGR Buildings were secure despite their responsibilities to do so; failed to develop an adequate security plan; failed to implement an adequate security plan; failed to properly conduct advance planning at the site of the Butler Rally which exposed the attendees at the event to grave danger and resulted in the wounding of President Trump and two attendees (including Claimant's husband), and the death of another attendee; failed to mitigate line of sight dangers; failed to properly and adequately

7

communicate, brief, work with and/or assign LLE to ensure that the attendees at the Butler Rally were safe; failed to properly delineate and/or establish responsibilities between LLE and the USSS despite that it was the responsibility of the USSS to do so; failed to provide appropriate guidance to LLE concerning its responsibilities at the Butler Rally; improperly positioned USSS and LLE personnel throughout the Butler Rally including within the AGR Building which allowed the roof of the building to remain unsecured providing a prime sniper position for the Shooter; failed to secure and control the immediate airspace in the vicinity of the rally, and President Trump; failed to provide and/or utilize required and necessary technology, manpower and/or assets, including, but not limited to, the C-UAS which if properly employed – as was required – would have alerted the USSS that the Shooter operated a drone over the rally site hours before the shooting; failed to or inadequately trained the C-UAS operator such that the agent was unprepared for any technical failure(s) of the equipment; the C-UAS operator failed to test the equipment in advance of the rally to ensure that it was operational despite his responsibility to do so, particularly as he alerted others responsible for site security that the C-UAS *would* be used in the days leading up to the Butler Rally, creating dependence on a non-existent security asset on the day of the rally; failed to establish proper lines of communication; failed to adequately secure and protect the site of the Butler Rally (both "inside" and "outside" established perimeters); failed to secure, monitor and/or control a known and identified high-risk area immediately adjacent to the venue of the Butler Rally, specifically the AGR Building and grounds which, among other things, provided a potential gunman with a clear line of sight to the stage where President Trump was speaking and also provided an elevated position from which to fire shots; failed to communicate to specific members of President Trump's security detail prior to the President taking the stage that a suspicious individual was identified at the Butler Rally, including that a BOLO was issued for said individual who attempted to assassinate President Trump; failed to advise President Trump's Security Detail of the suspicious behavior of the Shooter after President Trump took the stage so that his security detail could immediately remove him from danger, thereby preventing the shooting; improperly assigned inexperienced and/or inadequately trained personnel to assignments involving significant security responsibilities for which they were inadequately trained, ill equipped and unable to carry out; violated numerous USSS policies and procedures, including, but not limited to, USSS Office of Protective Operations ("OPO") Manual OPO-3, OPO-6, OPO-8, SOD-08, the USSS Strategic Intelligence and Information Manual CSD-04, USSS Internal Operating Procedures: Counter Sniper Team Advance Procedures; and other Policy and Procedure Manuals and requirements; provided improper and inadequate training to USSS personnel assigned to the Butler Rally; improperly and inappropriately deferred significant security responsibilities to LLE without appropriate communication despite that it is, and was, the function and responsibility of the USSS to ensure that the Butler Rally was safe for all attendees; failed to ensure that USSS counter-sniper agents adequately covered the AGR Complex, especially because of the direct line of sight from that vantage point to the stage where President Trump spoke; even though they could not delegate ultimate responsibility, the USSS failed to specifically and/or adequately advise LLE that the security of AGR Complex was their responsibility if that was their intention; improperly allowed fragmented, broken and/or inadequate lines of communication to exist which severely impeded the transmission of critical safety and security information prior to the shooting;

8

improperly allowed separate command posts to be established which further precluded the timely dissemination of critical security information; improperly failed to centralize a single command center where information can be timely and appropriately disseminated to all personnel providing security; improperly allowed critically important safety communications to take place over cell phones as opposed to radio traffic which impeded and delayed the exchange of important security and safety information; the USSS's fragmented communication system prevented USSS personnel from sharing critical information timely and accurately to prevent the shooting, which, amongst other things, allowed certain USSS agents to be made aware of the Shooter but not others, while failing to widely and timely share this information; failed to specifically assign either USSS personnel and/or LLE personnel to the AGR Complex given its proximity and direct line of sight to the stage where President Trump spoke; improperly allowed LLE counter-sniper personnel to define their own roles and positions despite that it is the sole responsibility of the USSS to delineate and assign those responsibilities; improperly conducted advance site procedures including, but not limited to, walkthroughs to ensure that the AGR Complex was secure; improperly allowed LLE counter-snipers to be located within the AGR Building as opposed to securing the roof; was specifically aware, or should have been aware, that the roofs of buildings located within the AGR Complex were unsecure contrary to policy and procedure; improperly failed to assign a USSS counter-sniper team to monitor the AGR Complex, especially given its proximity to the event and direct line of sight to the stage; despite the USSS's mandate and ultimate responsibility for securing the site for the protectee and attendees of the event, the USSS utterly failed to develop and implement a proper security plan to protect all individuals at the Butler Rally; failed to mitigate a clear and direct line of sight to the stage contrary to policy and procedure; the USSS failed to adequately and timely transmit information to President Trump's Security Detail that would have either prevented President Trump from taking the stage or removed him from the stage prior to the time shots were fired; the USSS failed to share threat assessment information with the USSS agents responsible for site security at the Butler Rally; improperly missed several opportunities to detain the Shooter despite that it was known that he was acting in a highly suspicious manner well before the shooting; due to a lack of manpower, inexperienced personnel from agencies outside the USSS were given significant security responsibilities despite that they were inadequately trained to carry out those responsibilities; the security and site plan for the Butler Rally failed to define clear roles, responsibilities and a chain of command reporting structure; the USSS has ultimate responsibility for security planning at protective venues, including specifically the Butler Rally, and the USSS failed in this responsibility; the USSS failed to communicate with all LLE's that aided in site security for the Bulter Rally, and this failure allowed unacceptable gaps in the security that the USSS was required to provide; the site of the Butler Rally presented important line of sight concerns which were required to and could have been mitigated by the USSS, but the USSS failed to alleviate or mitigate these concerns; the USSS failed in key objectives of a site security plan and failed to conduct the necessary and required due diligence to make the site safe for attendees; the USSS failed in its primary objective of preventing direct line of sight sniper positions which were a known, clear and identifiable threat to a protectee; the USSS failed in its long-standing mission and failed to implement procedures learned from prior assassination attempts, including that the USSS failed to give heightened attention to certain buildings involving higher risk than others;

9

failed to deploy and utilize appropriate resources to protect a former president in advance planning even though the "[l]ack of adequate resources is an unacceptable excuse for failing to improve advance precautions in this crucial area of Presidential protection" (*See e.g.,* Warren Commission Report at Chapter 8); and/or the USSS committed other failures, and was otherwise negligent, reckless and/or careless, all of which, individually and/or jointly, in whole or in part, allowed a gunman to fire eight shots at President Trump from the roof of the AGR Building which severely, permanently and grievously injured the Claimant's husband, President Trump and others.

10. The instant claim is filed by and on behalf of the Claimant, Marianne Copenhaver, for all damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Mr. James Copenhaver, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, as a result of her husband's injuries sustained at the Butler Rally on July 13, 2024, with no negligence on the part of the Claimant contributing thereto.

11. At the present time, witnesses include numerous individuals, including, but not limited to, presently unknown employees, agents, servants, and/or representatives of the USSS, including, the agents involved in the security work-up in advance of the Butler Rally, agents assigned to developing and implementing the site security plan for the Butler Rally, agents assigned to the Butler Rally on the day of the shooting, including, but not limited to, agents manning posts, agents assigned to the USSS Security Room, USSS counter-sniper personnel, and other USSS personnel, LLE officers and personnel who were involved in all of the foregoing activities in the days leading up to and on the day of the Butler Rally, and other LLE personnel, numerous eyewitnesses who observed some or all of the events set forth herein, any individual responsible for an investigation into the tragic events that unfolded at the Butler Rally including, but not limited to, USSS and LLE personnel, as well as members of Congress, aides and/or investigators, who were involved in any governmental investigation regarding the shooting, including those members who comprised and participated in the United States House of Representatives Task Force on the Attempted Assassination of President Trump which issued its Final Report dated December 5, 2024, which is incorporated herein by reference, as well as any Mission Assurance Review or After Action Reports conducted by the USSS or any other governmental agency; numerous first responders and others who responded to the scene of the shooting and rendered assistance, including, police, fire, emergency personnel, and others, all of whose identities are not yet known; other individuals who were present at the time of the shooting complained of herein whose identities are not yet known; the Claimant herein, her spouse, James Copenhaver, other members of the Claimant's family, friends, colleagues, and/or business associates, including, but not limited to, numerous individuals including current/former co-employees, professional colleagues; accountants; tax advisors;

10

financial advisors; all of the Claimant's medical providers that she has seen and will see as a result of the injuries her husband sustained in the shooting, and other family members, and other persons whose identities are presently unknown.

11

ORIGIN ID:RDVA    (202) 406-5708
UNITED STATES SECRET SERVICE
245 MURRAY LN SW - BLDG T-5

WASHINGTON, DC 20223
UNITED STATES US

TO DOUGLAS A. LATTO
SPEISER KRAUSE
800 WESTCHESTER AVE
SUITE S-608
RYE BROOK NY 10573
(914) 220-5333

RMA:
PO:
INV:
DEPT:
REF: COPENHAVER (M)

SHIP DATE: 31MAR25
ACTWGT: 0.50 LB
CAD: 9266552/INET4535

58CJ3/459E/C6C4

FedEx Express

TRK#
0221    7917 0179 6303

RETURNS MON-FRI
** 2DAY **

NY-US

10573

J251024121701uv

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

ORIGIN ID:CTYA          (914) 220-5333
DOUGLAS A. LATTO
SPEISER KRAUSE
800 WESTCHESTER AVE
SUITE S-608
RYE BROOK, NY 10573
UNITED STATES US

SHIP DATE: 31MAR25
ACTWGT: 0.50 LB
CAD: 9266652/INET4535

TO UNITED STATES SECRET SERVICE          BILL SENDER

245 MURRAY LN SW - BLDG T-5

WASHINGTON DC 20223

(202) 406-5708          REF: COPENHAVER (M)
INV:
PO:                     DEPT:

TRK# 8802 0561 1125

EP RDVA

TUE - 01 APR 10:30A
PRIORITY OVERNIGHT

DSR
20223
DC-US   IAD

FedEx Express

J251024121701uv

58CJ3/459E/C6C4

---

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



April 16, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 880205611125

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Shipping/Receiving |
| Signed for by: | R.Gill | Delivery Location: | 245 Murray Ln SW - BLDG T-5 |
| Service type: | FedEx Priority Overnight | | |
| Special Handling: | Deliver Weekday;<br>Direct Signature Required | | WASHINGTON, DC, 20223 |
| | | Delivery date: | Apr 1, 2025 10:09 |

---

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 880205611125 | Ship Date: | Mar 31, 2025 |
| | | Weight: | 0.5 LB/0.23 KG |

**Recipient:**
United States Secret Service,
245 Murray Ln SW - BLDG T-5
WASHINGTON, DC, US, 20223

**Shipper:**
Douglas A. Latto, Speiser Krause
800 Westchester Ave
Suite S-608
RYE BROOK, NY, US, 10573

**Reference**                    Copenhaver (M)



R. GILL
#1, 10:30, 120 Del, 0 NonDel

Thank you for choosing FedEx